## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROXUL USA, INC., | ) | |
| | ) | C.A. No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARMSTRONG WORLD | ) | JURY TRIAL DEMANDED |
| INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

This is an action to restrain anticompetitive conduct by Armstrong World Industries, Inc. ("Defendant") and to remedy the effect of its unlawful conduct.  Plaintiff ROXUL USA, Inc. d/b/a ROCKFON ("ROCKFON"), by its attorneys, brings this action for relief against Defendant's continued and ongoing violations of the Sherman Act, the Clayton Act, and Delaware common law.

## PARTIES

1.      Plaintiff ROXUL USA, Inc. d/b/a ROCKFON is a Delaware corporation having its principal place of business in Byhalia, Marshall County, MS.  ROCKFON is an insulation and ceiling systems manufacturer, and its Ceiling Tiles are marketed and sold in the United States of America and Canada under the ROCKFON brand.  ROCKFON is a subsidiary of ROCKWOOL International A/S ("ROCKWOOL"), a Danish corporation.

2.      Defendant Armstrong World Industries, Inc. ("Armstrong") is a Delaware Corporation with its principal place of business in Lancaster, PA.  Armstrong World Industries,

Inc. is a ceiling systems manufacturer, and its Ceiling Tiles are marketed and sold in the United States of America and Canada under the Armstrong brand.

## JURISDICTION AND VENUE

3.     This action is brought under Sections 1 and 2 of the Sherman Act; 15 U.S.C. §§ 1 and 2; Sections 3, 4, and 16 of the Clayton Act; and 15 U.S.C. §§ 14, 15, 26.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. §§ 15 and 26.

4.     Defendant is subject to personal jurisdiction in the State of Delaware for numerous reasons, including, but not limited to the following:  Defendant is a citizen of Delaware; Defendant has caused injury to ROCKFON within Delaware; Defendant practices the unlawful conduct complained of herein, in part, within Delaware; the unlawful conduct complained of herein causes tortious injury, in part, within Delaware; Defendant regularly does or solicits and conducts business within Delaware; Defendant regularly and systematically directs electronic activity into Delaware with the manifest intent of engaging in business within Delaware, including the sale and/or offer for sale of products to Internet users within Delaware through the armstrongceilings.com domain name.

5.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c), Defendant being found in and transacting business in this District.

## THE MARKET FOR CEILING TILES

6.     The relevant market for this action is the sale of suspended acoustical ceiling tiles ("Ceiling Tiles") sold in the United States of America and Canada (the "Geographic Market") (collectively, the "Market").

7.     Acoustic ceiling systems include Ceiling Tiles and suspension systems ("Grid Systems") (collectively referred to as an "Acoustic Ceiling System").

8.     Ceiling Tiles include rigid ceiling products designed to fit into suspension ceiling grids or direct mount applications, offering coverage of a building's plenum.

9.     Ceiling Tiles are typically a lay-in style surface designed to fit into a two foot by two foot or two foot by four foot grid pattern.

10.    Ceiling Tiles are available in a variety of fibrous substrates, including, but not limited to, fiberglass, mineral fiber, stone wool, and slag wool.

11.    Grid Systems are typically made of steel or aluminum and are designed to hold Ceiling Tiles below the duct work and electrical wiring and the structural ceiling of a building.

12.    Grid Systems of one manufacturer are capable of housing Ceiling Tiles from another manufacturer.

13.    Ceiling Tiles are often replaced as part of remodeling projects and/or when all or part of a building is updated.

14.    Grid Systems are often left intact even when Ceiling Tiles are replaced in order to upgrade the aesthetics or performance of a building.

15.    Ceiling Tile makes up the largest share of Acoustic Ceiling Systems demand, more than double the monetary value of Grid Systems.

16.    Ceiling Tiles are an important component of both residential and non-residential developments.

17.    The non-residential construction market, including both new construction and remodeling projects, constitutes in excess of 90% of Acoustic Ceiling Systems demand.

18.     Upon information and belief, the Geographic Market is the single largest Ceiling Tile market in the world, and Ceiling Tile demand is expected to exceed approximately $1 billion in 2018.

19.     Both parties produce a range of Ceiling Tiles which are comparable in quality and function.

20.     Both parties recognize Ceiling Tiles as a separate and distinct market apart from specialty and/or metallic ceiling systems.

21.     The parties have specialized sales and marketing strategies for sales of Ceiling Tiles.

22.     The United States and Canada is the relevant geographic market for sales of suspended acoustical ceiling tiles.

23.     There are worldwide regulatory standards differences, which prohibit the purchase of Ceiling Tiles from outside of the Geographic Market.

24.     There are shipping costs as well as additional costs and complexities in supply chain management, which make it impracticable to purchase Ceiling Tiles from outside of the Geographic Market.

25.     There are worldwide product differences, which prohibit the purchase of Ceiling Tiles from outside of the Geographic Market

**INTERCHANGEABILITY AND CROSS-ELASTICITY OF DEMAND ARE ABSENT**

26.     Ceiling Tiles grant their users the ability to easily access electrical and HVAC located behind the Ceiling Ties, and further provide quality sound absorption, fire protection, light reflectance, and humidity resistance at a cost-efficient price that allows users to quickly and easily install ceilings for large-scale non-residential projects as well as residential projects.

27.     Ceiling Tiles are a unique product without a functional equivalent or interchangeable substitute.

## THE ROLE OF BUILDING PRODUCTS DISTRIBUTORS

28.     Ceilings Tiles are primarily sold through Specialty Building Products Distributors ("Building Products Distributors").

29.     Building Products Distributors serve as the critical channel between manufacturers and a highly fragmented customer base made up of tens of thousands of contractors.

30.     Upon information and belief, Acoustic Ceiling Systems manufacturers, such as the parties, sell approximately 85% of Acoustic Ceiling Systems through Building Products Distributors due to the logistical complexity of distribution services, the expertise needed to execute distribution effectively, and the special equipment needed for efficient distribution.

31.     Building Products Distributors supply more than just Ceiling Tiles, as they offer a wide range of products to meet contractors' needs, such as, but not limited to, wallboard and accessories, metal framing, Grid Systems, stucco/exterior insulation and finishing systems, tools, safety accessories, and insulation.

32.      Building Products Distributors provide particular value-added services, such as, but not limited to, full-line product selection, nearby branches to contractors, logistics planning, product selection and application expertise, specialized and same-day delivery and service capabilities, storage, stocking services, credit, specialized payment terms, and technical product expertise and dedicated salespeople for Ceiling Tiles.

33.     Few large direct-buy installing contractors have the resources to accomplish some of the same value-added services as Building Products Distributors (such select contractors

hereinafter referred to as "Direct-Buy Installing Contractors"). However, the vast majority of direct-buy installing contractors do not have these capabilities and must rely on Building Products Distributors for distribution services.

34.     Big-box home improvement retailers are unable to service non-residential and most residential projects due to particularly limited product selection and servicing capabilities.

35.     There are no viable alternative channels to reach the Acoustic Ceiling Systems market.

36.     Alternative channels to market outside of Building Products Distributors, such as direct sales to job sites or sales through big-box home improvement supplies retailing companies are insufficient to meet the needs of most contracting projects, due to their inability to meet the logistical, servicing, and expertise needs of such projects.

37.     Building Products Distributors have continued to consolidate, as the largest Building Products Distributors have and continue to purchase several smaller distributors. Many previously independent, smaller, regional, and/or local competitors have been targeted and are now subject to the exclusivity agreements of their parent companies, further increasing the importance of Building Products Distributors.

## DEFENDANT HAS MONOPOLY POWER

38.     Defendant holds monopoly power in the Market.

39.     Upon information and belief, Defendant's Ceiling Tiles account for in excess of 55% of Ceiling Tile sales in the Market.

40.     Defendant is regarded by financial analysts as "dominating" the Ceiling Tile industry.

41.    There are only four major competitors in the Market, and Defendant's market share exceeds the combined market share of its three competitors.

42.    Defendant's monopoly power is evident due to its ability to raise prices despite downward trends in sales volume.

43.    Since 2011, Defendant's Acoustic Ceiling Systems business has implemented a number of price increases despite volume declines.

44.    Defendant is using its market power and unlawful restraints of trade to charge supra-competitive prices.

45.    Defendant's EBITDA ("earnings before interest, tax, depreciation, and amortization") margins grew from 20.0% in 2009 to 35.6% in 2016.

46.    Due to Defendant's monopoly power and unlawfully established network of exclusive distributors, it possesses pricing power in the Market and, as demonstrated below, the power to exclude competition.

47.    Defendant's monopoly power is particularly strong as consumers are not able to substitute comparable products from outside the Market because Ceiling Tiles are unique product without a reasonable substitute, and shipping costs as well as world-wide regulatory and product differences prohibit consumers from purchasing Ceiling Tiles from outside the Geographic Market.

48.    Defendant maintains monopoly power because Defendant's use of exclusive dealing agreements amongst a limited number of Building Products Distributors prohibits new competitors from freely entering the Market.

49.    The targeted consolidation of Building Products Distributors and Defendant's unlawful use of exclusivity agreements creates a significant barrier for new entrants to penetrate

the Ceiling Tile market and for existing competitors to gain market share.  Several Ceiling Tile manufacturers who compete in the European Union and other parts of the world do not compete in the Geographic Market because they are unable to access a viable distribution network.

50.     Due to Defendant's unlawful scheme of exclusive dealing agreements with Building Products Distributors, competitors have no efficient distribution channel available to penetrate and/or successfully compete in the Market.

## DEFENDANT'S RESTRICTIVE DEALING AGREEMENTS

51.     ROCKWOOL began selling Ceiling Tiles in the United States through its ROCKFON subsidiary in 2013.

52.     After ROCKWOOL's acquisition of Chicago Metallic Corporation ("CMC"), a Grid Systems manufacturer, in the same year, ROCKFON was able to offer complete Acoustic Ceiling Systems in the United States, incorporating ROCKFON stone wool Ceiling Tiles and CMC Grid Systems.

53.     After ROCKWOOL's purchase of CMC, ROCKFON became a direct competitor of and a significant threat to Defendant in the Market, due to its ability to offer a full line of high quality complete Acoustic Ceiling Systems.

54.     Upon information and belief, in direct response to ROCKWOOL's purchase of CMC and entry into the Ceiling Tile market in the United States, Defendant adopted and/or amended pre-existing regional exclusivity agreements to make them national exclusivity agreements that prohibit Building Products Distributors from selling competing Ceiling Tiles anywhere in the Geographic Market.

55.     Upon information and belief, since ROCKFON's entry into the Ceiling Tile market in the United States, Defendant's exclusivity agreements and practical application have specifically targeted ROCKFON.

56.     Upon information and belief, Defendant's exclusivity agreements and practical application prohibit Building Products Distributors from selling competitors' Ceiling Tiles.

57.     Upon information and belief, Building Products Distributors who have exclusivity agreements with the Defendant are prohibited from stocking and selling competitors' Ceiling Tiles.

58.     Upon information and belief, Defendant has policed and continues to actively police its Building Products Distributors to ensure compliance with its exclusivity agreements and has taken or threatened to take adverse actions against Building Products Distributors who violate the exclusivity agreements, by, among other things, raising prices for Defendant's Ceiling Systems products, terminating exclusivity agreements, and enforcing liquidated damages clauses.

59.     Upon information and belief, Building Products Distributors are unable to terminate the exclusivity agreements with Defendant because Defendant has threatened to and has taken retaliatory steps against Building Products Distributors that have attempted to and/or have actually terminated those agreements, including, but not limited to, by refusing to sell Defendant's products to them and enforcing liquidated damages clauses against them.

60.     Upon information and belief, a breach of Defendant's exclusivity agreement by a Building Products Distributor would result in a loss of supply of Defendant's Acoustic Ceiling System products.

61.     Upon information and belief, Defendant's application of its exclusive agreements extends beyond the written terms of the contract and specifically targets Building Products Distributors who sell or attempt to sell ROCKFON Ceiling Tiles.

62.     Upon information and belief, Defendant has threatened to stop supplying Defendant's products to its exclusive Building Products Distributors in retaliation for selling ROCKFON Ceiling Tiles if the distributor sells ROCKFON Ceiling Tiles in regions even where no exclusivity exists with the Defendant.

63.     Upon information and belief, Defendant has also leveraged its market power with non-exclusive Building Products Distributors to target ROCKFON by artificially raising prices as a penalty for selling ROCKFON Ceiling Tiles.

64.     Upon information and belief, Defendant has also unreasonably restrained non-exclusive Building Products Distributors by prohibiting them from purchasing Ceiling Tiles directly from competitors which raises the price for end-users.

65.     Upon information and belief, because of the consolidation of Building Products Distributors in conjunction with Defendant's exclusivity agreements, existing ROCKFON distributors were forced to stop selling ROCKFON Ceiling Tile.

66.     Upon information and belief, Defendant has induced a substantial number of Building Products Distributors to enter into exclusivity agreements, foreclosing ROCKFON from at least 65% of the Market.

67.     Upon information and belief, Building Products Distributors would prefer to carry multiple Ceiling Tile brands.

68.     Upon information and belief, Defendant has also induced Direct-Buy Installing Contractors to enter into exclusivity arrangements and/or agreements that prohibit their purchase and sale of competitors' Ceiling Tiles.

69.     Direct sales to direct-buy installing contractors and home improvement supplies retailing companies are not a reasonable or adequate substitute for the Building Products Distributors, because only Building Products Distributors meet the logistical, servicing, and expertise needs of large-scale projects which account for the vast majority of sales in the Market.

70.     Defendant's exclusivity agreements barring the sale of ROCKFON Ceiling Tile negatively impacts ROCKFON's Grid Systems sales as well.

71.     Defendant's exclusivity agreements and other anti-competitive tactics and unreasonable restraints create no market efficiency and serve no legitimate business purpose other than to stifle competition, raise the cost of competitors, raise cost to consumers, discourage new market entrants, and artificially increase Defendant's market share.

72.     Defendant's exclusivity agreements were designed to and have thwarted ROCKFON's and other competitors' attempts to build a viable distribution network, foreclosed their ability to compete in the Market, and prevented ROCKFON and other competitors from increasing market share.

73.     Competing Ceiling Tile manufacturers, including ROCKFON, have no reasonable or effective means of competing with Defendant's monopoly on Ceiling Tile sales to the Market.

74.     Through its use of exclusivity with a substantial number of Building Products Distributors, Defendant has been able to significantly raise prices and now charges more than 5% in excess of competitive market prices.

75.     Absent access to Building Products Distributors, competing manufacturers are not able to obtain or create effective, alternative channels of distribution and accordingly cannot effectively compete in the Market.

## ANTICOMPETITIVE EFFECTS

76.     ROCKWOOL was founded in 1937 in Denmark and entered the United States market in 2013.

77.     Defendant, a United States company founded in 1891, has competed in the Market since the 1960s.

78.     Both Defendant and ROCKWOOL compete in the European Ceiling Tile market along with a number of other manufacturers, including, but not limited to, AMF, Treetex, CEP, OWA, and Ecophon.

79.     Defendant and ROCKWOOL compete successfully in Europe and have grown comparable market shares.

80.     As a result of Defendant's implementation of exclusivity agreements targeting ROCKFON in the Market, ROCKFON's market share growth has been stunted in the Market.

81.     The exclusivity agreements have unfairly prevented ROCKFON from obtaining a comparable market share between the parties in the Market that exists in Europe.

82.     Defendant's exclusivity agreements have effectively stifled competition in the Market.

83.     Defendant's exclusivity agreements have discouraged and prevented the possible entry of competitors in the Market.  The Market has significantly less competitors than in other geographic regions.

84.     Upon information and belief, ROCKFON's foreclosure from the Market is exacerbated due to the use of other exclusivity agreements in the Market.

85.     Defendant's foreclosure to adequate distribution has successfully restricted competition in the Market and, absent court order, is likely to continue to foreclose competition and maintain/enhance Defendant's monopoly power.

86.     Defendant has imposed and enforces its exclusivity agreements for the purpose and with the effect of reducing or eliminating competition in the Market and maintaining its monopoly or attempting to monopolize the Market.

87.     The harm to competition is severe.  Building Products Distributors who enter into an exclusivity agreement are locked into selling Defendant's Ceiling Tiles and lose the ability to promote and sell competing brands in the Market.

88.     Architects specify the brand and performance of Ceiling Tile or Grid Systems ("spec") in at least 90% of interior construction projects.  When a contractor attempts to fulfill a ROCKFON spec with a Building Products Distributor that has an exclusivity agreement with the Defendant, (1) the Building Products Distributor will seek to change the ROCKFON spec and sell Defendant's Ceiling Tile instead, or (2) the contractor must seek a less desirable distributor, resulting in additional cost as well as logistical and customer service issues that negatively affect ROCKFON's brand.

89.     Upon information and belief, as a result of the absence of competition, the price of Ceiling Tiles in the Market has become and remains artificially inflated.

90.     Defendant's exclusivity agreements have resulted in higher prices, loss of choice, less market information, and lower quality of Ceiling Tiles in the Market.  But for Defendant's

exclusivity agreements, other manufacturers of Ceiling Tiles, including ROCKFON, would be able to obtain higher market shares.

91.    But for the exclusivity agreements, additional Ceiling Tile manufacturers would have attempted to enter the Market.

92.    But for the exclusivity agreements, prices for Ceiling Tiles in the Market would be lower.

93.    But for the exclusivity agreements, contractors would have a greater choice of Ceiling Tiles and more market information about competing Ceiling Tiles.

94.    But for the exclusivity agreements, contractors would have received lower-priced, higher-quality, and more desirable Ceiling Tiles.

95.    Defendant's exclusivity agreements will continue to prevent competing Ceiling Tile manufacturers from access to Building Products Distributors, thus continuing to restrain price, quality, competition, and reduce consumer information and choice for Ceiling Tiles in the Market.

96.    Defendant's conduct is not justified by efficiencies or legitimate business considerations.

97.    The harm being suffered by ROCKFON is immediate, because with each day that passes, ROCKFON is losing opportunities to compete on the merits in the Market.

98.    The harm to ROCKFON is irreparable because there is no way to fully measure ROCKFON's loss.

## COUNT I

## MONOPOLIZATION

99.     ROCKFON repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1-98 as if fully set forth herein.

100.    The relevant market for this action is the sale of Ceiling Tiles in the United States and Canada.

101.    Upon information and belief, Defendant's Ceiling Tiles account for in excess of 55% of Ceiling Tile sales in the Market.

102.    Defendant's aforementioned deliberate conduct of excluding competition in the Market through the use of exclusivity agreements constitutes willful maintenance of its monopoly power in the market of sales of Ceiling Tiles throughout the Market and constitutes unlawful monopolization in interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

103.    The harm to competition or anticompetitive effect of Defendant's conduct includes keeping output below and prices above what they would be in the presence of unrestrained market competition in the Market.  This results from Defendant's conduct which limits consumer choice, raises competitors' costs, and creates artificial barriers to entry from a necessary means of distribution.

104.    As a direct and proximate cause of the foregoing, ROCKFON has been injured in its business and property, is threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendant is enjoined from soliciting, entering into, and enforcing exclusivity agreements with Building Products Distributors of Ceiling Tiles, or from engaging in other practices, including, but not limited to, any other similar exclusionary agreements, designed to foreclose and exclude ROCKFON and other competitors from the market, and from engaging in other illegal conduct alleged herein.

## COUNT II

## ATTEMPTED MONOPOLIZATION

105.   ROCKFON repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1-104 as if fully set forth herein.

106.   The relevant market for this action is the sale of Ceiling Tiles in the United States and Canada.

107.   Upon information and belief, Defendant's Ceiling Tiles account for in excess of 55% of the Ceiling Tile sales in the Market.

108.   Defendant has the specific intent to monopolize the market of the sale of Ceiling Tiles throughout the Market.   Defendant's aforementioned deliberate conduct of excluding competition in the Market through the use of exclusivity agreements has been undertaken to achieve, maintain, and extend such monopoly, and to the extent that the Defendant has not already obtained monopoly power, there is a dangerous possibility that it will succeed in obtaining it.

109.   Through the use of exclusivity agreements, Defendant is attempting to monopolize the market of Ceiling Tiles throughout the Market in interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

110.   The harm to competition or anticompetitive effect of Defendant's conduct includes keeping output below and prices above what they would be in the presence of unrestrained competition in the Market.   This results from Defendant's conduct which limits consumer choice, raises competitors' costs, and creates artificial barriers to entry from a necessary means of distribution.

111.     As a direct and proximate result of the foregoing, ROCKFON has been injured in its business and property, is threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendant is enjoined from soliciting, entering into, and enforcing exclusivity agreements with Building Products Distributors of Ceiling Tiles, or from engaging in other practices, including, but not limited to any other similar exclusionary agreements, designed to foreclose and exclude ROCKFON and other competitors from the market, and from engaging in other illegal conduct alleged herein.

## COUNT III

### CONCERTED ACTION IN RESTRAINT OF TRADE

112.     ROCKFON repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1-111 as if fully set forth herein.

113.     The relevant market for this action is the sale of Ceiling Tiles in the United States and Canada.

114.     Upon information and belief, Defendant's Ceiling Tiles account for in excess of 55% of Ceiling Tile sales in the Market.

115.     Defendant has entered into exclusivity agreements with Building Products Distributors of Ceiling Tile, maintained and enforced those agreements, otherwise acted in concert with those distributors, and sold Ceiling Tiles on the condition that those distributors refrain from marketing, advertising, promoting, or selling competitive products or purchase products directly from competitors, thereby causing a substantial lessening of competition in the Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

116.    Defendant has market power in the Market and Defendant has exercised that market power through exclusivity agreements.

117.    The harm to competition or anticompetitive effect of Defendant's conduct includes keeping output below and prices above what they would be in the presence of unrestrained competition in the Market.  This results from Defendant's conduct which limits consumer choice, raises competitors' costs, and creates artificial barriers to entry from a necessary means of distribution.

118.    As a direct and proximate result of the foregoing, ROCKFON has been injured in its   business and property, is threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendant is enjoined from soliciting, entering into, and enforcing exclusivity agreements with Building Products Distributors of Ceiling Tiles, or from engaging in other practices, including, but not limited to, any other similar exclusionary agreements, designed to foreclose and exclude ROCKFON and other competitors from the market, and from engaging in other illegal conduct alleged herein.

119.    The sale of Ceiling Tiles across state lines constitutes interstate commerce and, further, exclusivity agreements substantially affect interstate commerce.

## COUNT IV

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (DELAWARE COMMON LAW)

120.    ROCKFON repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1-119 as if fully set forth herein.

121.    Defendant had existing business relationships with certain distributors of Ceiling Tiles and potential business relationships with others interested in working with ROCKFON.

122.    Defendant had knowledge of ROCKFON's existing business relationships and potential business relationships with others interested in working with ROCKFON.

123.    Defendant knowingly, intentionally, wrongfully, and maliciously interfered with ROCKFON's advantageous business relationships.

124.    Defendant's actions have harmed ROCKFON's business relationships with current distributors and potential distributors.  ROCKFON's loss of these advantageous business relationships resulted directly from Defendant's improper and unlawful actions.

125.    ROCKFON has suffered substantial damages, in an amount to be determined at trial, as a result of Defendant's improper and unlawful actions.

### **REQUEST FOR RELIEF**

WHEREFORE, ROCKFON prays for judgment:

A.  Enjoining Defendant from soliciting, entering into, or enforcing exclusionary agreements which prohibit Building Products Distributors from marketing, advertising, promoting, or selling competing products or otherwise impairing their ability to carry and sell ROCKFON and other competing products;

B.  Enjoining Defendant from soliciting, entering into, or enforcing exclusionary agreements which prohibit Building Products Distributors from buying products directly from competitors, including ROCKFON.

C.  Enjoining Defendant from taking any action or threatening to take any action against Building Products Distributors or others who carry and sell ROCKFON or other competing products;

D. Enjoining Defendant from engaging in any other exclusionary practices which directly or indirectly foreclose ROCKFON and other competing competitors from distributing Ceiling Tiles;

E. Awarding ROCKFON damages in an amount to be determined, and trebled as provided for in Section 4 of the Clayton Act, 15 U.S.C. § 15;

F. Awarding ROCKFON the cost of this suit, including reasonable attorneys' fees, as provided for in Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and pre and post-judgment interest; and

G. Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  September 1, 2017                    FARNAN LLP


                                            */s/ Michael J. Farnan*
                                            Joseph J. Farnan, Jr. (Bar No. 100245)
                                            Brian E. Farnan (Bar No. 4089)
                                            Michael J. Farnan (Bar No. 5165)
                                            919 North Market Street
                                            12th Floor
                                            Wilmington, DE 19801
                                            (302) 777-0300
                                            (302) 777-0301
                                            farnan@farnanlaw.com
                                            bfarnan@farnanlaw.com
                                            mfarnan@farnanlaw.com

                                            *Counsel for Plaintiff ROXUL USA, Inc.*


*Of Counsel:*
Christopher S. Finnerty
Jeffrey S. Patterson
Michael R. Murphy
Morgan T. Nickerson
K&L GATES LLP
State Street Financial Center, One Lincoln Street
Boston, MA 02111-2950
(617) 261-3100
(617) 261-3175 (Fax)
chris.finnerty@klgates.com
jeffrey.patterson@klgates.com
michael.r.murphy@klgates.com
morgan.nickerson@klgates.com