## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ROXUL USA, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **NO. 17-1258** |
| **ARMSTRONG WORLD INDUSTRIES,** | : | |
| **INC.** | : | |

### MEMORANDUM

**KEARNEY, J.**                                                    **February 9, 2018**

Competing manufacturers relying upon a limited number of companies qualified to distribute their product to consumers may seek to induce the distributors' primary allegiance in a number of ways which we do not consider unlawfully anti-competitive. One effort which can invite scrutiny is a manufacturer's exclusivity agreement with a distributor with penalties for selling other products when the manufacturer enjoys a 55% market share and the market continues to lose qualified distributors. In addressing these issues in the suspended acoustical ceiling tile industry, we today find a manufacturer with a smaller market share adequately pleads anti-competitive conduct by a manufacturer with a much larger market share through exclusivity agreements in the relevant market in the United States but not, as yet, in Canada and does not plead a claim for tortious interference with contractual relationships. In the accompanying Order, we grant the larger manufacturer's motion to dismiss claims against it for anti-competitive conduct in the Canadian market and for tortious interference but deny its motion to dismiss the remaining claims under the Sherman and Clayton Acts subject to further discovery.

## I.    Alleged facts.

Roxul USA, Inc. and Armstrong World Industries, Inc. manufacture and sell ceiling tiles and related products in the United States and Canada.[1]    Roxul and Armstrong produce ceiling tiles comparable in quality and function.[2]    Ceiling tiles are used in both residential and non-residential spaces, but the non-residential market accounts for at least 90% of the demand for ceiling tiles.[3]    Armstrong holds at least a 55% share of the ceiling tile market in the United States and Canada.[4]    In total, three firms, including Roxul, compete against Armstrong in the ceiling tile market in the United States and Canada.[5]

Ceiling tile manufacturers sell approximately 85% of their ceiling tile offerings through distributors specializing in building project materials.[6]    The vast majority of ceiling tile consumers are building contractors purchasing materials for interior construction projects. Contractors rely on distributors because they offer a wide-range of building material products in addition to ceiling tiles and provide multiple offerings for each material type.[7]    Distributors also provide services such as same day delivery, logistical planning, product selection and installation expertise, storage and stocking services, and a knowledgeable sales force.[8]    Contractors rely on distributors because very few contractors have the resources and network necessary to achieve the same efficiencies as specialized distributors.[9]    Due to market forces, regional and national distributors have consolidated resulting in limited numbers of distributors capable of servicing Roxul and Armstrong.[10]

Roxul challenges Armstrong's actions with distributors to protect its market share in this consolidating distributor market, including through exclusivity agreements.[11]    Following Roxul's entry into this market in 2013, Armstrong expanded its geographic scope of the exclusivity with some distributors from regional to national exclusivity or exclusivity throughout the United

States and Canada.[12]  Armstrong's exclusive distributors are not permitted to carry Roxul's or other competing firms' ceiling tiles.[13]  Armstrong polices its exclusivity arrangements by raising prices to distributors who violate the exclusivity arrangement, enforcing liquidating damages provisions, or refusing to supply its products to the distributors after the breach.[14]  Armstrong also threatens to retaliate against distributors who sell or attempt to sell Roxul and other competing products in non-exclusive territories.[15]  Armstrong also signed exclusivity contracts with some direct purchasers.[16]  Roxul alleges these steps allow Armstrong to raise its prices and now charge more than 5% over competitive prices despite an overall decline in sales volume in the ceiling tile market since 2011.[17]

## II.  Analysis

Roxul alleges Armstrong's exclusivity arrangements with building material distributors violates the Sherman Act[18] and Clayton Act.[19]  Roxul alleges Armstrong unlawfully obtained and maintained a monopoly under Section 2 of the Sherman Act.  In the alternative, Roxul argues Armstrong is attempting to monopolize the ceiling tile market in violation of Section 2 of the Sherman Act.  Roxul also alleges Armstrong engaged in concerted action in restraint of trade in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.  Finally, Roxul alleges Armstrong tortiously interfered with Roxul's business relations with building material distributors.

Armstrong moves to dismiss Roxul's complaint.[20]  Armstrong challenges Roxul's definition of the ceiling tile market and argues we lack subject matter jurisdiction over foreign commerce in Canada.  Armstrong argues Roxul failed to allege it holds monopoly power in the ceiling tile market.  Armstrong argues its exclusivity arrangements with distributors are not anti-competitive because it has valid business justifications for exclusivity and it did not foreclose

3

Roxul from a substantial portion of the ceiling tile market. Armstrong argues Roxul failed to plead antitrust injury. Finally, Armstrong argues Roxul failed to plead tortious interference with business relations because it did not identify a contract Armstrong interfered with or identify a prospective business relationship with necessary specificity.

### A. Roxul fails to state a claim of antitrust violations based on foreign trade under the Foreign Trade Antitrust Improvements Act.

Armstrong challenges Roxul's definition of the relevant market as "the sale of suspended acoustical ceiling tiles . . . sold in the United States of America and Canada."[21]    Armstrong specifically challenges Roxul including ceiling tile sales in Canada. Armstrong argues the Foreign Trade Antitrust Improvements Act ("Act")[22] prohibits our exercise of jurisdiction over foreign conduct under the Sherman Act.[23]   Roxul alleges it sufficiently plead the "domestic commerce exception" to the Act.

The Sherman Act "shall not apply to conduct involving trade or commerce (other than important trade or commerce) with foreign nations."[24] But there are exceptions for conduct creating a "direct, substantial and reasonably foreseeable effect" on domestic trade or commerce, import trade or import commerce with foreign nations, or export trade or commerce with foreign nations.[25]  The Act requires we determine the "geographical effect" of the alleged conduct.[26] The conduct at issue must also "have an effect of a kind that antitrust law considers harmful."[27] Stated differently, conduct involving foreign trade falls within the Sherman Act if the conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce and such effect gives rise to a claim under the Sherman Act. When the proffered anti-competitive conduct affects both customers outside the United States and within the United States but the adverse foreign effect "is independent of any adverse domestic effect," the domestic commerce exception does not apply and the Sherman Act does not apply.[28]  "The [Act] requires a plaintiff to allege

4

that its claims were directly caused by the domestic effects of the conduct and not the foreign effects."[29]  "Courts discussing the 'direct effects' requirements of the [Act] have recognized that 'direct effect' means that there must be an 'immediate consequence of the alleged anticompetitive conduct with no 'intervening developments.'"[30]  Allegations of conduct resulting in a "ripple effect" on domestic commerce are insufficient to satisfy the domestic commerce exception.[31]

In *In re Intel Corp. Microprocessor Antitrust Litig. v. Intel Grp.*,[32] the plaintiff argued the defendant's anti-competitive conduct involving foreign commerce resulted in the plaintiff losing foreign sales and weakened the plaintiff as a domestic rival to the defendant.[33]  The court found the plaintiff's argument insufficient to satisfy the "direct effects" standard.[34]  The court described the alleged effect as speculative and found the plaintiff failed to identify how the foreign conduct resulted in a "substantial and direct domestic effect."[35]  The court also discounted plaintiff's reliance on pleading it is an American company engaged in foreign commerce, as courts assess the geographical effect of foreign conduct as opposed to the location of the parties under the Act.[36]

Roxul fails to allege how foreclosure from the Canadian market because of Armstrong's exclusivity contracts directly, substantially, and foreseeably affects United States commerce. Foreclosure from the Canadian market certainly impacts Canadian commerce and consumers by limiting their choice and reducing competition in Canada, but Roxul fails to allege how reduced competition in Canada directly affects domestic commerce.  Roxul argues its claim encompasses injury to competition in both the United States and Canada.  We agree, as discussed below, Roxul has adequately alleged Armstrong's foreclosure of competition in the United States market impacted domestic commerce.  But under the Act, Roxul must allege how the foreclosure

from the Canadian market directly and substantially affected domestic commerce. Even if Roxul's allegations allowed for an inference the foreclosure from Canada impacted Roxul's foreign sales thereby impacting its profitability and resulting in lost opportunity to compete domestically with Armstrong, such effect would be speculative and insufficient to allege a direct effect on domestic commerce.[37] Based on the present pleading, we can only fairly conclude the effect from Armstrong foreclosing Roxul and other competing firms from the Canadian market is separate and independent from the effect Armstrong's conduct created in the United States market.

### B. Roxul pleads monopolization under the Sherman Act.

Roxul alleges Armstrong unlawfully obtained and maintained monopoly power in the ceiling tile market through its exclusivity arrangements with building material distributors. Armstrong argues Roxul's allegations of Armstrong controlling at least 55 percent of the ceiling tile market is insufficient to plead monopoly power. Armstrong also argues its exclusivity arrangements are not anti-competitive and offers business justifications for the exclusive contracts. Armstrong argues Roxul fails to state a plausible antitrust injury because Roxul only seeks relief for injury to itself, not competition.

To plead monopolization under Section 2 of the Sherman Act, Roxul must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition of maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."[38] "Monopoly power is the ability to control prices and exclude competition from the given market."[39] To support an inference of monopoly power, a plaintiff typically must plead "a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market."[40] Absent other factors, our

6

court of appeals has found a market share of 55% is typically insufficient to demonstrate *prima facie* monopoly power.[41] Other factors to consider to determine whether a firm holds monopoly power include, "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods or services from outside the market, and consumer demand factors."[42] Whether a firm can charge "supracompetitive prices" is also relevant to determining monopoly power.[43]

Anti-competitive conduct under the second element includes "behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."[44] We apply the rule of reason in assessing whether the use of exclusivity contracts is anticompetitive.[45] An exclusive dealing arrangement violates the rule of reason when the "'probable effect' of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals.'"[46] Roxul must allege the exclusivity arrangement resulted in "substantial foreclosure" to the relevant market.[47] Foreclosure does not become substantial by pleading a particular fixed percentage and courts look to whether the exclusivity arrangement "bar[s] a substantial number of rivals or severely restricts the market's ambit."[48] "Exclusive dealing arrangements are of special concern when imposed by a monopolist."[49]

To plead antitrust injury, Roxul must allege it suffered the type of harm antitrust laws are intended to prevent and the injury flows "from that which makes the defendants' acts unlawful."[50]

Roxul plausibly pleads monopoly power. Roxul alleges Armstrong holds a market share "in excess of 55%."[51] Although an allegation of 55% alone may not be sufficient to allege monopoly power, Roxul alleges a high barrier of entry into the market and Armstrong's history

of controlling prices despite an overall decrease in sales volume in the market.[52] Only three companies compete against Armstrong in the ceiling tile market.[53] Armstrong has raised its prices since 2011, despite an overall decrease in sales volume in the ceiling tile market.[54] Armstrong now charges 5% over competitive market prices.[55] Roxul alleges only a few distributors are capable of servicing companies the size of Roxul.[56] Regional and local distributors have consolidated with national distributors expanding the reach of the Armstrong exclusivity agreements.[57] Roxul alleges Armstrong's exclusivity agreements with key distributors prevented new competitors from entering the market and remaining competitive.[58] Viewing these facts favorably to Roxul as we must do at this stage, Roxul sufficiently alleges monopoly power.

Roxul plausibly pleads Armstrong's willful acquisition of monopoly power through exclusivity agreements resulting in anti-competitive conduct. Armstrong argues Roxul fails to plead substantial foreclosure in the ceiling tile market. Armstrong argues Roxul's claim the exclusivity arrangements with distributors resulted in a 65% foreclosure to the ceiling tile market is unsubstantiated. Armstrong argues under the facts alleged it can only theoretically foreclose at most its total market share – 55%. Armstrong narrows its argument on the percentage alleged but ignores the supporting facts. Roxul is not required to allege a specific foreclosure percentage and we analyze all the facts in the complaint to determine whether substantial foreclosure is alleged.[59]

Specialty building products distributors are a critical channel between manufacturers, like Armstrong and Roxul, and consumers.[60] Ceiling tile manufacturers sell about 85% of their ceiling tile product through these distributors.[61] Manufacturers rely on distributors because they are able to efficiently manage the "logistical complexity of distribution services."[62] Distributors

also provide a wide range of products to best meet consumer needs such as walling, metal framing, grid systems necessary to install ceiling tiles, necessary tools for installation, and safety accessories.[63]  Distributors also provide supplemental services such as logistical planning, same day delivery, product selection and installation expertise, and networking with local contractors.[64]   Consolidation of distributors heightened the importance of ceiling tile manufacturers' maintaining relationships with the limited number of distributors.[65]  Without access to distributors, manufacturers lack access to a viable distribution channel end-users rely upon to make ceiling tile purchases.[66]

The exclusivity agreements prohibit distributors from selling competitor ceiling tiles nationally or regionally, depending on the agreement.[67]  Roxul also alleges Armstrong retaliates against distributors who violate the exclusivity provision by charging the distributors higher prices for its products, enforcing liquidated damages clauses, and choosing to stop supplying Armstrong ceiling tiles to the distributor.[68]  Armstrong's exclusivity with distributors coupled with fear of retaliation for selling Roxul products forced distributors to stop carrying Roxul products.[69]  Roxul sufficiently alleges Armstrong's exclusivity agreements and its retaliatory conduct foreclosed competition in the ceiling tile market.

Armstrong argues Roxul failed to allege substantial foreclosure because alternative channels of distribution allow Roxul to reach consumers.  Armstrong cites to Roxul's allegations identifying direct buy contractors and big-box home improvement retailers as potential alternative distribution channels.[70]  But Roxul alleges very few direct buy contractors exist because they lack the financial resources and expertise to establish the same value-added services specialty distributors provide.[71]  Roxul alleges big-box retailers are unable to service most commercial projects because of their limited product selection and inability to provide

9

supplemental services.[72]  Roxul alleges these distribution channels are not viable options to reach ceiling tile consumers.[73]  Armstrong also cites to Roxul's allegation architects "spec" or specify the brand of ceiling tile in 90% of interior construction projects.[74]  Armstrong argues this allegation proves the selection of ceiling tile brand is "in the hands of the consumer."  Armstrong argues Roxul could promote and sell its products to architects at the specification phase.  But Armstrong ignores Roxul's allegation when contractors attempt to fulfill an architect's spec from exclusive distributors, the distributor attempts to change the Roxul spec to an Armstrong spec or faces the risk of retaliation from Armstrong.[75]  We accept Roxul's allegations at this preliminary stage.  Armstrong's factual defense regarding the availability and viability of alternative distribution channels is best reserved for summary judgment or trial.

Armstrong argues it has a valid business justification for entering into exclusivity agreements with distributors.  Armstrong argues the pro-competitive effects of the exclusivity arrangements outweigh the anti-competitive effects.  Armstrong argues its exclusivity arrangements encourage distributors to more aggressively market Armstrong products. Armstrong asserts exclusivity arrangements prevent "free riding on the substantial investments that manufacturers (like Armstrong) make with distributors to promote their own products."[76] Roxul alleges sufficient facts outlining the anti-competitive effects the exclusivity arrangements have on the ceiling tile market.[77]  Weighing pro-competitive and anti-competitive effects is best reserved for summary judgment or trial after the benefit of discovery.[78]

Armstrong argues Roxul fails to plead plausible antitrust injury because it does not allege Armstrong's conduct injured competition and Roxul's alleged harm is not casually connected to Armstrong's conduct. Contrary to Armstrong's argument, Roxul alleges harm to competition in the ceiling tile market.  Roxul alleges the exclusivity arrangements between Armstrong and

10

distributors foreclosed Roxul and other competitors from the ceiling tile market.[79] Armstrong's exclusivity arrangements have prevented possible competitors from entering the market and reduced consumer choice in the ceiling tile market.[80] Viewing the facts alleged favorably to Roxul, we allow for a reasonable inference the injury to competition is casually connected to Armstrong's exclusivity arrangements with building material distributors. Roxul adequately pleads antitrust injury. Roxul states a claim for monopolization under the Sherman Act.

## C. Roxul pleads attempted monopolization under the Sherman Act.

Roxul alleges Armstrong's exclusivity deals are an unlawful attempt to monopolization under Section 2 of the Sherman Act. Armstrong raises the same arguments it raised to Roxul's monopolization claim: (1) Roxul has not alleged anticompetitive conduct and (2) Roxul has not alleged antitrust injury.

To state a claim for attempted monopolization under Section 2 of the Sherman Act, Roxul must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous possibility of achieving monopoly power."[81] We consider many factors in determining whether a defendant has a dangerous probability of achieving monopoly power including the size of the defendant's market share, strength of competition, barriers to entry into the market, the nature of the alleged anticompetitive market, the elasticity of consumer demand, and the probable development of the relevant industry.[82] Determining whether there is a dangerous probability of achieving monopoly power is "a particularly fact intensive inquiry."[83] "Courts typically should not resolve this question at the pleading stage 'unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law.'"[84]

As described earlier, Roxul adequately alleges anticompetitive conduct through exclusivity arrangements with distributors. The exclusivity arrangements foreclose competitors from accessing a significant portion of the ceiling tile market.[85] Roxul's allegations also allow for a reasonable inference Armstrong acted with the specific intent to monopolize. Armstrong pursued exclusivity arrangements with key distributors in the ceiling tile industry and have actively policed and enforced the exclusivity arrangements to the detriment of competition in the ceiling tile market.[86] Roxul's sufficiently pleads monopoly power as discussed above, but in the alternative, Roxul also sufficiently pleads a dangerous probability of achieving monopoly power. Roxul alleges Armstrong's exclusivity arrangements prevent the entry of new competitors into the market, foreclose competitors from a significant portion of the market, and allow Armstrong to raise its prices despite an overall decrease in sales volume.[87] Only three firms compete against Armstrong in the ceiling tile market.[88] Roxul sufficiently pleads antitrust injury of foreclosure from a significant portion of the ceiling tile market. Roxul states a claim of attempted monopolization under Section 2 of the Sherman Act.

### D. Roxul pleads concerted action in restraint of trade under the Sherman Act and Clayton Act.

Roxul alleges Armstrong engaged in concerted action in restraint of trade with building material distributors in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. Section 1 of the Sherman Act prohibits every contract or conspiracy in restraint of trade or commerce.[89] To state a claim under Section 1 of the Sherman Act, Roxul must allege (1) the defendant was a party to a contract, combination or conspiracy and (2) the contract, combination or conspiracy imposed an unreasonable restraint on trade.[90] To plead an unreasonable restraint on trade, Roxul must allege the concerted action resulted in anticompetitive effects within the market.[91] Section 3 of the Clayton Act prohibits a firm from entering into exclusivity

12

arrangements where the effect of such arrangement "may be to substantially lessen competition or tend to create a monopoly in any line of commerce."[92] To determine the legality of an exclusive dealing arrangement under the Clayton Act, we determine "whether the competition foreclosed constitutes a substantial share of the relevant market."[93] Roxul relies on the same theory asserted above: Armstrong's exclusivity arrangements foreclosed Roxul and other competing firms from a substantial portion of the ceiling tile market.

Armstrong raises the same arguments it raised in defense to Roxul's Sherman Act claims. These arguments fail today for the same reasons. Roxul sufficiently alleges a contractual arrangement between Armstrong and distributors creating an exclusive distribution relationship.[94] Roxul also sufficiently alleges the contracts created an unreasonable restrain on trade by foreclosing competitors from entering the market and foreclosing competitors from a substantial share of the ceiling tile market.[95] Roxul states a claim under Section 1 of the Sherman Act and Section 3 of the Clayton Act.

### E. Roxul fails to plead tortious interference with business relationships under Delaware law.

Roxul claims Armstrong tortiously interfered with its business relations by entering into exclusivity arrangements with distributors and by prohibiting non-exclusive distributors from purchasing Roxul and other competitors ceiling tiles. Roxul claims Armstrong interfered with its existing and prospective business relationships. To the extent Roxul's claim is based on existing business relationships, Armstrong argues Roxul failed to allege the existence of a contract between Roxul and a distributor and failed to allege a breach of the contract. To the extent Roxul's claims is based on prospective business relations, Armstrong argues Roxul did not identify a specific party with which it held a prospective business relationship.

13

To state a claim for tortious interference with existing contractual relations, Roxul must allege "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[96] To state a claim for tortious interference with prospective business relations, Roxul must allege (1) the reasonable probability of business opportunity, (2) the intentional interference by the defendant with that opportunity, (3) proximate causation, and (4) damages.[97] To satisfy the first element, Roxul "must identify a specific party who was prepared to entered [sic] into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm.'"[98] "While the plaintiff does not need to identify a party by name, the plaintiff must do more than offer 'vague statements about unknown customers.'"[99] "A plaintiff cannot plead this element by alleging a 'nebulous, unascertainable class' of business relationships."[100]

Roxul fails to state a claim for tortious interference with existing contractual relations. Roxul does not allege a contractual relationship between it and a distributor and does not allege Armstrong's interference resulted in the distributor breaching an agreement with Roxul. Roxul also fails to state a claim for tortious interference with prospective business relationships. Roxul fails to allege a reasonable probability of business opportunity. Roxul alleges Armstrong prohibited distributors from selling Roxul ceiling tile products.[101] To the extent these distributors sold Roxul products, interference with the distributors would not be interference with prospective relations. It is unclear from Roxul's allegations if distributors sought to sell Roxul ceiling tile products and Armstrong prevented these sales. Roxul cites its allegation upon information and belief "Building Products Distributors would prefer to carry multiple Ceiling Tile brands."[102] But Roxul does not allege facts supporting an inference of a single distributor

14

prepared to enter into a business relationship with Roxul. These types of macro allegations suffice for our Sherman and Clayton Act analysis, but not under the elements of tortious interference under Delaware law. We are aware of no exception to tortious interference law in the anti-competitive context. Roxul fails to state a claim for tortious interference with prospective business relations.

### III. Conclusion

Roxul adequately pleads Armstrong's exclusivity arrangements in the United States' suspended acoustical ceiling tile market violate the Sherman Act and Clayton Act. Armstrong's fact defenses are best reserved for summary judgment or trial. We dismiss Roxul's claim for antitrust violations to the extent Roxul bases its claim on foreign trade in Canada and its claim for tortious interference with business relationships without prejudice should Roxul be able to plead facts consistent with this Memorandum under Fed. R. Civ. P. 11.

---

[1] ECF Doc. No. 1 at ¶¶ 1-2.

[2] *Id.* at ¶ 19.

[3] *Id.* at ¶ 17.

[4] *Id.* at ¶ 39.

[5] *Id.* at ¶ 41.

[6] *Id.* at ¶ 28.

[7] *Id.* at ¶ 31.

[8] *Id.* at ¶ 32.

[9] *Id.* at ¶ 33.

[10] *Id.* at ¶ 37.

[11] *Id.* at ¶ 48.

[12] *Id.* at ¶ 54.

[13] *Id.* at ¶ 57.

[14] *Id.* at ¶¶ 58-59.

[15] *Id.* at ¶ 62.

[16] *Id.* at ¶ 68.

[17] *Id.* at ¶ 74.

[18] 15 U.S.C. § 1, *et seq.*

[19] 15 U.S.C. § 12, *et seq.*

[20] In deciding a motion to dismiss under Rule 12(b)(6), we accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party, but we "are not compelled to accept unsupported conclusions and unwarranted inference, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017) (quoting *In re Vehicle Carrier Serv. Antitrust Litig.*, 846 F.3d 71, 79 n.4 (3d Cir. 2017)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Maiden Creek Assoc., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Our court of appeals requires we apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[21] ECF Doc. No. 1 at ¶ 6.

[22] 15 U.S.C. § 6a.

[23] Our court of appeals instructs as the limitations contained in the Act are "substantive merits limitations" rather than a jurisdictional bar. *Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462, 468-69 (3d Cir. 2011). Our court of appeals clarified challenges under the Act must be decided under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, as opposed to Rule 12(b)(1) for lack of subject matter jurisdiction. *Id.* at 469. We assess whether Roxul states a claim under the Sherman Act as to the foreign conduct at issue rather than assess whether we have subject matter jurisdiction over the foreign conduct.

[24] 15 U.S.C. § 6a.

[25] *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161-62 (2004); *Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462, 465-66 (3d Cir. 2011).

[26] *In re Intel Corp. Microprocessor Antitrust Litig. v. Intel Corp.*, 452 F Supp. 2d 555, 560 (D. Del. Sept. 26, 2006).

[27] *F. Hoffman-La Roche Ltd.*, 542 U.S. at 162; 15 U.S.C. § 6a(2).

[28] *F. Hoffman-La Roche Ltd.*, 542 U.S. at 162.

[29] *In re Intel Corp. Microprocessor Antitrust Litig. v. Intel Corp.*, 452 F Supp. 2d at 561.

[30] *Id.* at 560 (citation omitted).

[31] *Id.* at 561.

[32] 452 F Supp. 2d 555, 560 (D. Del. Sept. 26, 2006).

[33] *Id.* at 560.

[34] *Id.* at 560-61.

[35] *Id.* at 561.

[36] *Id.*

[37] *See id.* at 560-61.

[38] *In re Mushroom Direct Purchase Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. Apr. 25, 2007) (quoting *Crossroads Congregation Corp. v. Orange & Rockland Utils., Inc.*, 159 F. 3d 129, 141 (3d Cir. 1998)).

[39] *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citation omitted).

[40] *Id.* (quoting *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005)).

[41] *See Fineman v. Armstrong World, Indus.*, 980 F.2d 171, 201-02 (3d Cir. 1992).

[42] *Id.* (citation omitted).

[43] *Broadcom Corp.*, 501 F.3d at 307 (citing *United States v. Microsoft Corp.* 253 F.3d 34, 51 (D.C. Cir. 2001)).

[44] *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, No. 15-108, 2016 WL 264909, at *8 (D. Del. Jan. 21, 2016) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)).

[45] *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403-04 (3d Cir. 2016).

[46] *Id.* (citation omitted).

[47] *See id.*

[48] *Id.* (citation omitted).

[49] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (citing *United States v. Dentsbly Int'l*, 399 F.3d 181, 187 (3d Cir. 2005)).

[50] *In re Processed Egg Prods. Antitrust Litig.*, __ F.3d __, No. 16-3795, 2018 WL 671128, at *5 (3d Cir. Jan. 22, 2018).

[51] ECF Doc. No. 1 at ¶ 39.

[52] *Id.* at ¶¶ 42-44, 48-50.

[53] *Id.* at ¶ 41.

[54] *Id.* at ¶¶ 42-44.

[55] *Id.* at ¶ 74.

[56] *Id.* at ¶ 48.

[57] *Id.* at ¶ 37.

[58] *Id.* at ¶ 48.

[59] *See Eisai, Inc.*, 821 F.3d at 404 (identifying foreclosure does not become substantial at a "fixed percentage").

[60] ECF Doc. No. 1 at ¶ 29.

[61] *Id.* at ¶ 30.

[62] *Id.* at ¶ 30.

[63] *Id.* at ¶ 31.

[64] *Id.* at ¶ 32.

[65] *Id.* at ¶ 37.

[66] *Id.* at ¶ 50.

[67] *Id.* at ¶¶ 54-57.

[68] *Id.* at ¶¶ 58-60.

[69] *Id.* at ¶ 65.

[70] *Id.* at ¶¶ 33-34.

[71] *Id.* at ¶ 33.

[72] *Id.* at ¶ 34.

[73] *Id.* at ¶ 35.

[74] *Id.* at ¶ 88.

[75] *Id.*

[76] ECF Doc. No. 10 at p. 23.

[77] ECF Doc. No. 1 at ¶¶ 71-75, 82-98.

[78] *See In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 170 n. 64 (3d Cir. 2017) (identifying difficulty of assessing fact intensive rule of reason analysis, even at the summary judgment stage).

[79] ECF Doc. No. 1 at ¶¶ 85-86.

[80] *Id.* at ¶¶ 82-83, 95.

[81] *Broadcom Corp.*, 501 F.3d at 317 (citation omitted).

[82] *Id.* at 318 (citation omitted).

[83] *Id.*

[84] *Id.* (citation omitted).

[85] ECF Doc. No. 1 at ¶¶ 65-66.

[86] *Id.* at ¶¶ 54-75.

[87] *Id.* at ¶¶ 65-66, 72, 74.

[88] *Id.* at ¶ 41.

[89] 15 U.S.C. § 1.

[90] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citation omitted).

[91] *UniStrip Techs., LLC v. LifeScan, Inc.*, 153 F. Supp. 3d 728, 739-40 (E.D. Pa. Dec. 28, 2015).

[92] 15 U.S.C. § 14.

[93] *UniStrip Techs., LLC*, 153 F. Supp. 3d at 738 (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003)).

[94] ECF Doc. No. 1 at ¶¶ 54-56.

[95] *Id.* at ¶¶ 66, 72-73, 75, 83.

[96] *Bhole, Inc. v. Shore Ins., Inc.*, 67 A.3d 444, 453 (Del. 2013) (citation omitted) (emphasis in original).

[97] *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. Jun. 5, 2017) (citation omitted).

[98] *Id.* (citation omitted).

[99] *Id.* (citation omitted).

[100] *Id.* at 122-23.

[101] ECF Doc. No. 1 at ¶¶ 56-60, 63-64.

[102] *Id.* at ¶ 67.