IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| ROXUL USA, INC. | : | CIVIL ACTION |
|---|---|---|
| v. | : | |
| | : | NO. 17-1258 |
| ARMSTRONG WORLD INDUSTRIES, INC. | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                                                 **March 8, 2019**

Commercial acoustical ceiling tile manufacturer Roxul USA, Inc., doing business as Rockfon, claims its largest American competitor Armstrong World Industries, Inc. requires building supply distributors sign agreements, as a condition of selling Armstrong ceiling tiles, prohibiting the distributor from selling a ceiling tile other than Armstrong ceiling tile and, even if the distributor does not sell Armstrong ceiling tile in a certain geographic area, to still not sell Roxul's ceiling tile sold through its Rockfon company. Roxul seeks damages from Armstrong alleging anti-competitive conduct prohibited by federal law. Armstrong claims its agreements are not anti-competitive under federal law. Roxul hired Professor Einer Elhauge of Harvard University to assist the jury in understanding the alleged anti-competitive conduct. Armstrong hired Dr. Janusz Ordover of New York University to assist the jury in understanding how its agreements are not anti-competitive. We face the prototypical battle of economic competition experts. Armstrong now moves we preclude Professor Elhauge's opinions as lacking a reliable fact basis and possibly not fitting Roxul's anti-competitive claims. We studied Professor Elhauge's lengthy opinions. At counsel's request, we evaluated his testimony in a hearing where Armstrong cross-examined him. After this analysis, we find Professor Elhauge's testimony based

on his disclosed opinions is reliable, fits the issues, and will assist our jury. We deny Armstrong's motion to preclude his opinions at trial.

## I. Analysis.[1]

Armstrong argues Professor Elhauge's methodology supporting his opinions lacks reliability and his opinions do not fit the facts of this complex anti-trust challenge in a national market with multiple channels to sales. Roxul, the seller of acoustical ceiling tile through its United States company Rockfon, responds Professor Elhauge used reliable methods fitting the facts. While finding Armstrong raises several fair questions better suited for jury evaluation, we cannot preclude Professor Elhauge's opinions.

Federal Rule of Evidence 702 governs admissibility of an expert's testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[2]

When determining whether to exclude testimony, we act "as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief or unsupported speculation."[3] As a gatekeeper, we must ensure the proffered expert opinions "reliably follow from the facts known to the expert and the methodology used."[4] We do not preclude expert opinions because we may disagree with the findings. Roxul, in adducing

Professor Elhauge's opinions, bears the burden of showing a basis for admitting his testimony by a preponderance of the evidence.

Armstrong advances several arguments as to why we should exclude Professor Elhauge's testimony as to foreclosure, anticompetitive conduct, and injury. We address each in turn.

**A.   Professor Elhauge may opine as to substantial foreclosure and anticompetitive harm.**

   **1.   Armstrong's challenge to falsity of foreclosure assumption.**

Armstrong argues we should exclude Professor Elhauge's opinion regarding substantial foreclosure because (1) he ignored Rockfon's growth, (2) he failed to assert Armstrong's exclusivity agreements bind contractors to purchase Armstrong tiles, (3) he failed to prove contractors cannot freely choose to purchase different tile brands.

Roxul argues (1) Professor Elhauge did not ignore Rockfon's growth but found Rockfon would have grown "two times faster but-for the market foreclosure,"[5] and (2) our Court of Appeals rejected arguments against foreclosure when the defendant did not foreclose the "ultimate consumers."

Roxul can still show foreclosure despite its growth. In *McWane, Inc. v. FTC*, the court of appeals for the Eleventh Circuit held a plaintiff can prove foreclosure even when "the targeted rival gained market share—but less than it likely would have absent the conduct."[6] The court, citing our Court of Appeals' decisions in *ZF Meritor* and *Dentsply,* explained "exclusive dealing measures that slow a rival's expansion can still produce consumer injury."[7]

While Armstrong argues its exclusivity agreements do not bind contractors, we do not look only at contractors as the "ultimate consumers." In *Dentsply*, the defendant manufacturer argued because the plaintiff could sell its tooth products directly to dental laboratories, it had not foreclosed the plaintiff by exclusively dealing with dental distributors. The district court concluded

3

the defendant could not exclude rivals from the market because it did not have exclusive agreements with the "ultimate consumers," the dental laboratories.[8] Our Court of Appeals explained the district court clearly erred by focusing on "ultimate consumers" when manufacturers sell to both distributors and dental laboratories.[9] Our Court of Appeals found the defendant excluded rivals from the market through its exclusive arrangements with distributors, even though the agreements did not contractually bind the dental laboratories.

We do not exclude Professor Elhauge's opinion on foreclosure. Professor Elhauge amply demonstrates while Rockfon grew in the relevant time period, it grew "less than it likely would have absent the conduct." Professor Elhauge cites evidence showing, while Armstrong's exclusivity agreements do not bind contractors, contractors may not have "the ability to make a meaningful choice" because of their reliance on preferred distributors.[10] Professor Elhauge cited evidence showing the tiles brands a distributor carries influence a contractor's choice.[11]

Both Professor Elhauge and Dr. Ordover relied on a survey amongst contractors.[12] When asked whether they prefer a particular ceiling tile brand, several contractors identified distributor availability as the most important factor, with responses including "[n]umber 1 is our supplier," "the main thing [is] the service I get from my distributor," and "having the distributor have the product in stock."[13] When asked to rate factors "important to contractors in determining their preferred brand," the most important factors were "lowest price for product" and "availability and service from the distributor or dealer you prefer."[14] Professor Elhauge also relied on evidence showing distributors' sales forces influence the brands contractors purchase.[15] We do not exclude as unreliable Professor Elhauge's opinion regarding foreclosure because Armstrong's exclusivity agreements do not contractually bind end-users.

2. **Challenge to including repair and replace sales.**

4

Armstrong argues we must exclude Professor Elhauge's foreclosure opinion because it incorrectly includes Armstrong's "repair and replace" sales. Roxul responds Armstrong's foreclosure share includes "all sales subject to the foreclosing conduct, even if [Armstrong] still would have made some of those sales but-for the foreclosing conduct."[16] Professor Elhauge testified at our *Daubert* hearing Armstrong's position in "repair and replace" jobs exacerbate the effect of its exclusivity agreements.

While Armstrong argues Roxul's inclusion of "repair and replace" sales warrants exclusion of Professor Elhauge's opinion, we note our Court of Appeals have affirmed foreclosure findings even when the foreclosure calculations include sales the defendant would have made despite the alleged anticompetitive conduct.[17] To the extent Armstrong challenges Professor Elhauge's foreclosure calculation, it can cross-examine him on his basis and conclusions.

### 3. Challenge to aggregating USG and Armstrong conduct.

Armstrong argues Professor Elhauge improperly aggregates the conduct of USG and Armstrong to arrive at its foreclosure calculation. Roxul argues Supreme Court precedent allows Professor Elhauge to aggregate Armstrong and USG's conduct.

In *Standard Oil Co. of California v. United States*, the United States sued Standard Oil alleging its exclusivity contracts with petroleum dealers violated the Sherman and Clayton Acts.[18] The Supreme Court considered Standard Oil's competitors used similar exclusivity agreements. In finding foreclosure, the Court explained the effect of Standard Oil and its competitors' conduct "ha[d] been to enable the established suppliers individually to maintain their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market."[19]

In *Federal Trade Commission v. Motion Picture Advertising Service Co.*, the defendant advertising company had exclusivity agreements with movie theaters to play advertisements in the theaters.[20] The defendant and three other companies in the market maintained exclusive agreements with theaters.[21] The Commission charged only the defendant and found the "[defendant]'s exclusive contracts unreasonably restrain competition and tend to monopoly" under the Federal Trade Commission Act.[22] The Supreme Court affirmed the Commission. It found substantial evidence to support the Commission's finding, explaining the "[defendant] and the three other major companies have foreclosed to competitors 75 percent of all available outlets for this business throughout the United States."[23] The Supreme Court also found the defendant's conduct violated the Sherman Act.

Armstrong cites the dissent in *Motion Picture* to support its argument Roxul may not aggregate foreclosure. Concerning the court's decision to aggregate the conduct of the defendant and the non-defendant companies, Justice Frankfurter, who wrote the majority opinion in *Standard Oil*, explained "[w]hile the existence of the other exclusive contracts is, of course, not irrelevant in a market analysis, this Court has never decided that they may, in the absence of conspiracy, be aggregated to support a charge of Sherman Law violation."[24]

While Armstrong cites district court cases outside our circuit, we find the Supreme Court approved aggregation in the context of the antitrust laws. Again, Armstrong can cross-examine Professor Elhauge on his basis and conclusions.

### 4. Challenge to anticompetitive harm for denying "most efficient" distributors.

Armstrong argues Professor Elhauge's opinion warrants exclusion because he bases anticompetitive harm on Armstrong foreclosing the "most efficient" distributors. Roxul argues our

6

Court of Appeals allows a finding of foreclosure when the defendant prevents access to the most efficient distributors.

In *Dentsply*, the defendant signed exclusivity agreements with distributors to sell artificial teeth. The defendant argued against foreclosure because manufacturers could sell teeth directly to dental laboratories. The defendant's competitor sold through dealers, but the defendant maintained exclusivity agreements with twenty-three "key dealers" in the market, leaving hundreds of other distributors for competitors.[25] Our Court of Appeals reversed the district court's grant of summary judgment for the defendant, holding the defendant excluded rivals because the defendant maintained exclusive dealing agreements with "the key dealers."[26] Although competitors could sell through nonexclusive distributors, the court held such alternative channels were not viable as the defendant "block[ed] access to the key dealers," explaining "the firm that ties up the key dealers rules the market."[27]

Armstrong's argument for excluding Professor Elhauge's opinion citing preclusion from the "most effective dealers" fails. As explained, a jury may find no foreclosure if we find Rockfon can utilize alternative channels for selling ceiling tiles. But these alternative channels must be *viable*. If Rockfon's distributors were so inefficient as to prevent competition from rivals, a jury may find such alternatives to foreclosed distributors are not viable. Professor Elhauge cited evidence Armstrong's largest distributors—Foundation and Gypsum Management—purchased smaller distributors selling Rockfon tiles. After the acquisition, the "No Rockfon" clause in Foundation and Gypsum Management's agreements then bound these smaller distributors, foreclosing a portion of the distribution network. Roxul contends Foundation and Gypsum Management are two of the biggest distributors in the market.

7

Roxul adduced evidence Armstrong had exclusivity agreements with "stronger distributors."[28] Professor Elhauge explained the 2017 Simon-Kutcher report shows Rockfon had access to lesser quality distributors due to foreclosure. Simon-Kutcher rated distributors on a scale of one to five, weakest to strongest.[29] It concluded distributors covered by Armstrong's exclusivity agreements rated on average 3.5, while unforeclosed distributors rated 2.2.[30] Professor Elhauge also cited evidence Armstrong's exclusivity forced Rockfon to rely on an insulation distributor with "lack of specialized [ceiling tile] knowledge and ceiling contractor relationships."[31]

We cannot exclude Professor Elhauge's testimony based on this evidence-based opinion. In his foreclosure analysis, Professor Elhauge assesses the ceiling tile market, including the effectiveness of the distributors in the market. He cites evidence Rockfon could not access the most effective distributors. A jury can use this evidence to determine whether the alternative channels available to Rockfon—here, the inferior "unforeclosed" distributors—were a viable means to sell its products. Armstrong cites caselaw outside of our Circuit to argue we cannot find foreclosure because Rockfon could not access the most efficient distributors. But our Court of Appeals requires we must look whether alternative channels are viable. Professor Elhauge's opinion assists the jury in this analysis, subject to cross-examination and rebuttal.

### 5. Challenge to failing to show substantial anticompetitive effect.

Armstrong argues Professor Elhauge fails to show the exclusivity agreements had a "substantial" anticompetitive effect on competition.[32] Roxul argues Professor Elhauge shows (1) Rockfon would have 100% greater revenue shares but for foreclosure, (2) foreclosure caused Rockfon to delay investment in a United States manufacturing plant; (3) Rockfon's slow growth prevented it from achieving economies of scale.

We find Professor Elhauge shows substantial anticompetitive effect. Our Court of Appeals explained when a monopolist enacts exclusivity agreements impeding a new market entrant, anticompetitive effect results "from the delay that the dominant firm imposes on the smaller rival's growth."[33] We find Professor Elhauge presents evidence of substantial anticompetitive effect. The jury may not believe this opinion. But it is reliable and fits the issues.

B. **Professor Elhauge may opine Armstrong's exclusivity agreements produce zero efficiencies.**

1. **Challenge to ignoring Rockfon's and CertainTeed's exclusivity agreements.**

Armstrong argues we should exclude as unreliable Professor Elhauge's opinion Armstrong's exclusivity agreements produce "zero" procompetitive effects.[34] Armstrong argues Professor Elhauge ignored Rockfon and CertainTeed entered into exclusivity agreements.

Roxul responds a "lower-level Rockfon employee" entered into a single exclusivity agreement Rockfon terminated in 2013.[35] Roxul also responds Armstrong ignores Professor Elhauge acknowledged CertainTeed's exclusivity agreements failed because it lacked market power to exclude Rockfon.[36]

We do not exclude Professor Elhauge's testimony on this ground. Professor Elhauge provided factual basis for his opinion Armstrong's exclusivity agreements lack "procompetitive effects." Professor Elhauge found CertainTeed's exclusivity agreements failed because it lacked power to exclude rivals.[37] This evidence supports Professor Elhauge's opinion exclusivity agreements are anticompetitive. We cannot say, as Armstrong argues, an exclusivity agreement is procompetitive merely because Rockfon and CertainTeed uses them. Professor Elhauge's opinion does not lack a factual basis to make it unreliable. To the extent Armstrong challenges Professor

9

Elhauge's assumptions, Armstrong may cross-examine him based on this allegedly similar conduct.[38]

### 2. Challenge to ignoring efficiencies.

Armstrong argues we should exclude Professor Elhauge's opinion because he "denies that exclusivity is a source of *any* procompetitive benefits to distributors."[39] Roxul responds Professor Elhauge acknowledged exclusivity agreements can have procompetitive effects but found Armstrong's agreements have no procompetitive effects. We agree with Roxul and leave the decision of which theory succeeds for the jury.

Contrary to Armstrong's argument, Professor Elhauge acknowledges "exclusive dealing agreements can have procompetitive effects in some cases."[40] Professor Elhauge also explained he found no procompetitive effects in this case. Acknowledging exclusive dealing can lead to investment in distributors, he found Armstrong's only "manufacturer agnostic" investment in its distributors consisted training course for which it charged attendees $1500.[41] We cannot say Professor Elhauge's testimony is unreliable because he concluded Armstrong's agreements produce no procompetitive effects.

### 3. Challenge to finding exclusive agreements do not incentivize distributors.

Armstrong argues we should exclude Professor Elhauge's opinion because he "rejected the view that Armstrong's exclusive distribution agreements incentivize distributors to promote Armstrong's brand more aggressively."[42] Roxul responds while Professor Elhauge acknowledged an exclusivity agreement can incentivize a distributor, Armstrong's agreements fail to incentivize distributors.

In his deposition, Professor Elhauge explained the evidence did not support a finding "Armstrong's exclusive distribution agreements incentivize distributors to promote Armstrong's

10

brand more aggressively."[43] Professor Elhauge rather found "[t]he evidence suggests to the contrary, that [Armstrong's agreements] preclude competition, and thus, incentivize lackluster or weaker efforts to promote any brand because one brand is exclusive, so there's less free market competition for sales."[44] Professor Elhauge based this opinion on his finding Armstrong provided smaller rebates than Rockfon.[45] Professor Elhauge supported his opinion with facts from the record. We cannot find his opinion is unreliable.

### 4. Challenging opinion exclusivity incentivizes distributors to provide distorted or misleading info.

Professor Elhauge opines distributor incentivization does not necessarily benefit consumers. He explains exclusive agreements "actually provide dealers an incentive to provide distorted or misleading information to consumers in an attempt to convince consumers that the exclusive brand is best, given that the distributor will lose the customer's business if the customer chooses a brand that the distributor is not allowed to carry."[46] Armstrong characterizes Professor Elhauge's opinion exclusivity incentivizes distributors to provide misleading information as absurd. We cannot say Professor Elhauge's opinion is absurd as Armstrong suggests.

Armstrong also argues Professor Elhauge's opinion would lead to the conclusion any business would provide misleading information. Armstrong compares distributors to Apple Store employees and argues an Apple Store employee has an incentive to provide misleading information about Apple products.[47] The comparison fails, as distributors generally carry different product brands. Roxul argues contractors trust distributors to provide neutral advice when selecting brands of building products.[48]

The cases Armstrong cite do not concern exclusive dealing. But *Leegin Creative Leather Products, Inc. v. PSKS, Inc.* supports Roxul's argument.[49] In *Leegin*, the Supreme Court dealt with the legality of "resale price maintenance agreements," manufacturer agreements with distributors

11

setting the minimum price the distributor can charge for the manufacturer's goods.[50] The Court explained while they can have procompetitive benefits, vertical agreements—like exclusive dealing in our case—can have "anticompetitive effects."[51] A powerful manufacturer can abuse the vertical arrangement tactic of resale price maintenance by "giv[ing] retailers an incentive not to sell the products of smaller rivals or new entrants."[52]

Roxul argues Armstrong uses its exclusivity agreements to prevent distributors from selling products from Rockfon, a company with a smaller market share than Armstrong. We cannot say Professor Elhauge's opinion is absurd. We do not exclude Professor Elhauge's opinion exclusivity agreements incentivize distributors to provide misleading information.

## C. We allow Professor Elhauge to describe his damages model.

Armstrong argues we should exclude Professor Elhauge's damages model as unreliable. Professor Elhauge calculated damages based on Rockfon's revenue from 2014 to 2018 amongst unforeclosed customers—customers not bound by Armstrong's exclusivity agreements. Professor Elhauge explained "[a] conservative benchmark for how much [ceiling tiles] Rockfon would sell in the but-for world (where there would be no anticompetitive foreclosure) is Rockfon's actual share of [ceiling tiles] to unforeclosed customers."[53] We address each of Armstrong's arguments.

### 1. We allow foreclosure and anticompetitive harm opinions.

Armstrong argues we should exclude Professor Elhauge's damages model for the same reasons it argues we should exclude his foreclosure and anticompetitive harm opinions. Because we rejected Armstrong's arguments on foreclosure and anticompetitive harm, we deny Armstrong's arguments for exclusion of Professor Elhauge's damages model for the same reasons.

### 2. Claiming Professor Elhauge's damages model suffers from selection bias.

Armstrong argues Professor Elhauge's damages model suffers from selection bias because contractors can purchase any ceiling tile they desire. Armstrong concludes Professor Elhauge's damages calculation includes contractors who wanted to purchase Armstrong tiles. Roxul argues (1) Armstrong merely speculates as to contractors' preference, (2) ceiling tiles only account for a small portion of a contractor's purchases from distributors, (3) foreclosure forced Rockfon to use unfavored distributors, and (4) Rockfon's market share among "direct-to-contractor" sales is similar to its share amongst unforeclosed customers. Roxul's argument is persuasive at least as to allowing Professor Elhauge explain this theory to the jury and face cross-examination.

Professor Elhauge swore when contractors purchase building materials from a distributor, eighty-four percent are materials other than ceiling tiles.[54] Because ceiling tiles account for approximately sixteen percent of a contractor's purchases, Professor Elhauge opines a contractor would not choose another distributor because of a preferred ceiling tile brand.[55] We cannot say Professor Elhauge's opinion is unreliable. Combined with Professor Elhauge's finding Armstrong forced Rockfon to rely on unfavored distributors,[56] we cannot find Professor Elhauge's opinion suffers from selection bias as to render it unreliable.

Both Professor Elhauge and Dr. Ordover recognized Rockfon's market share among "direct-to-contractor" sales as a "benchmark to estimate Rockfon's but-for world sales."[57] Thus, Armstrong's expert acknowledges one can measure sales in the "but-for" world with sales in the unforeclosed world. We cannot say measuring damages based on actual performance amongst unforeclosed customers is unreliable.

### 3. Claiming Professor Elhauge ignore key features of the "but-for" world.

Armstrong argues we should exclude Professor Elhauge's damages calculation because he failed to consider, in the "but-for" world: (1) Armstrong's exclusive distributors may voluntarily

13

sell only Armstrong tiles, (2) Armstrong's "minimum purchase terms" in its agreements would still have a competitive effect, and (3) Rockfon would face additional competition from Armstrong.

Roxul responds Professor Elhauge did not assume Rockfon would sell to every exclusive Armstrong distributor in the "but-for" world. Professor Elhauge accounted for competition as the unforeclosed market he considered includes sales from Armstrong, USG, and CertainTeed.

We do not exclude Professor Elhauge's damages model for failure to identify key features of the "but-for" world. Armstrong's expert acknowledged sales in the unforeclosed market are a "benchmark" for sales in the "but-for" world. To the extent Armstrong challenges alleged deficiencies in Professor Elhauge's damages model, it can raise these issues on cross-examination.

### 4. Accounting for USG foreclosure in damages.

Armstrong asks we exclude Professor Elhauge's damages model because it includes damages attributable to USG's exclusivity agreements. Roxul argues Professor Elhauge offered two alternative damages calculations based on Armstrong's conduct alone and Armstrong and USG's conduct together. Roxul further argues because Supreme Court precedent allows it to aggregate conduct for its foreclosure calculation, it may do so in damages as well. Professor Elhauge described these alternative calculations during our evidentiary hearing. He explained the alternative nature of his fact patterns. He described the methodology. These are issues for the jury.

## II. Conclusion.

We do not view *Daubert* analysis as the time to decide who is right or which theory we would adopt. We evaluate whether there is a reliable basis for the opinions fitting the facts. Professor Elhauge submitted an exhaustive analysis supporting his positions. Armstrong will have fertile territory to examine on these issues. It raises several fair points. But Professor

14

Elhauge's opinions will assist the jury in understanding the complexity of competition claims based on the challenged conduct including Armstrong's agreements. We deny Armstrong's motion to preclude Professor Elhauge's opinions in the accompanying Order.

---

[1] Armstrong filed its Motion to Exclude Professor Elhauge's Testimony at ECF Doc. 210 and its memorandum at ECF Doc. No. 212. Roxul filed its response in opposition at ECF Doc. 244. Armstrong filed its reply at ECF Doc. 255. The parties filed its Joint Appendix at ECF Docs. No. 201, 239, and 258.

[2] Fed. R. Evid. 702.

[3] *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *2 (E.D. Pa. July 29, 2015).

[4] *Heller v. Shaw Indus.*, 167 F3d 146, 153 (3d Cir. 1999).

[5] ECF Doc. No. 244 (Roxul Response to Motion to Exclude), at p. 2.

[6] *McWane, Inc. v. FTC*, 783 F.3d 814, 838 (11th Cir. 2015).

[7] *Id.* at 838 (first citing XI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 76 (3d ed. 2011); then citing *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005); and then citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012)).

[8] *Dentsply*, 399 F.3d at 190.

[9] *Id.*

[10] *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 404 (3d Cir. 2016) (quoting *ZF Meritor*, 696 F.3d at 285).

[11] ECF Doc. No. 201, at JA6793-95 (Elhauge Report).

[12] *Id.* at JA6794 (Elhauge Report); JA6931 (Ordover Report).

[13] *Id.* at JA6794 (Elhauge Report).

[14] *Id.*

[15] *Id.* at JA6795 (Elhauge Report).

[16] ECF Doc. No. 244 (Roxul Response to Motion to Exclude), at p. 8.

[17] *See ZF Meritor*, 696 F.3d at 278; *Dentsply*, 399 F.3d at 194.

[18] *Standard Oil Co. of Ca. v. United States*, 337 U.S. 293 (1949).

[19] *Id.* at 309.

[20] *Fed. Trade Comm'n v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 395 (1953).

[21] *Id.* at 393.

[22] *Id.* at 395.

[23] *Id.*

[24] *Id.* at 399-400 (Frankfurter, J., dissenting) (citing *Standard Oil*, 337 U.S. at 309).

[25] *Dentsply*, 399 F.3d at 191.

[26] *Id.* at 190.

[27] *Id.* at 196 ("The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market.").

[28] ECF Doc. No. 239 (Joint App.), at JA7966 (Armstrong Internal Report).

[29] ECF Doc. No. 201 (Joint App.), at JA7210 (Elhauge Rebuttal Report).

[30] *Id.*

[31] *Id.*

[32] ECF Doc. No. 212 (Armstrong Memorandum in Support of Motion to Exclude), at p. 11.

[33] *ZF Meritor*, 696 F.3d at 290 (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 64 (2d ed. 2002)).

[34] ECF Doc. No. 212 (Armstrong Memorandum in Support of Motion to Exclude), at p. 12.

[35] ECF Doc. No. 239 (Joint App.), at JA8065-66 (N.T. J. Moynihan, Sept. 11, 2018).

[36] ECF Doc. No. 201 (Joint App.), at JA6815-16 (Elhauge Report).

[37] *Id.*

[^38] *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination."); *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-0652, 1998 WL 175888, at *6 (E.D. Pa. Apr. 15, 1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999) ("Questions as to the sufficiency of an expert's factual basis are generally left to the jury.").

[^39] ECF Doc. No. 212 (Armstrong Memorandum in Support of Motion to Exclude), at p. 13.

[^40] ECF Doc. No. 201 (Joint App.), at JA6854 (Elhauge Report).

[^41] *Id.* at JA7239-40 (Elhauge Rebuttal Report).

[^42] ECF Doc. No. 212 (Armstrong Memorandum in Support of Motion to Exclude), at p. 13.

[^43] ECF Doc. No. 201 (Joint App.), at JA7535 (N.T. E. Elhauge, Jan. 14, 2019).

[^44] *Id.*

[^45] *Id.* at JA7242 (Elhauge Rebuttal Report) (finding "Rockfon made larger proportional investments in 'Gold Circle'-like promotional programs than Armstrong did with the benefit of exclusivity").

[^46] *Id.* at JA6854 (Elhauge Report).

[^47] ECF Doc. No. 212 (Armstrong Memorandum in Support of Motion to Exclude), at p. 14.

[^48] ECF Doc. No. 244 (Roxul Response to Motion to Exclude), at p. 16.

[^49] 551 U.S. 877 (2007).

[^50] *Leegin*, 551 U.S. at 882.

[^51] *Id.* at 892.

[^52] *Id.* at 894.

[^53] ECF Doc. No. 201 (Joint App.), at JA6857 (Elhauge Report).

[^54] ECF Doc. No. 239 (Joint App.), at JA8225 (N.T. E. Elhauge, Jan. 14, 2019).

[^55] *Id.*

[^56] ECF Doc. No. 201 (Joint App.), at JA7210 (Elhauge Rebuttal Report) (finding the "average distributor strength (rate 1-5, weakest to strongest) was 3.5 for foreclosed distributors but only 2.2

for accessible distributors, confirming that the foreclosure forced Rockfon to turn to less efficient distributors").

[57] *Id.* at JA7318 (Ordover Rebuttal Report).