**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROXUL USA, INC., | |
| Plaintiff, | |
| v. | C.A. NO. 17-CV-01258-MAK |
| ARMSTRONG WORLD INDUSTRIES, INC., | |
| Defendant, | |

### DEFENDANT ARMSTRONG WORLD INDUSTRIES, INC.'S OBJECTIONS TO PLAINTIFF ROXUL USA, INC'S PROPOSED JURY INSTRUCTIONS

Daniel G. Swanson (*pro hac vice*)
Shannon E. Mader (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel:   213.229.7000
dswanson@gibsondunn.com
smader@gibsondunn.com

Cynthia E. Richman (*pro hac vice*)
Thomas G. Hungar (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Tel:   202.955.8500
crichman@gibsondunn.com
thungar@gibsondunn.com

Caeli A. Higney (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-2933
Tel:   415.393.8200
chigney@gibsondunn.com

Kevin J. Mangan (DE Bar No. 3810)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Tel:   320.252.4320
kevin.mangan@wbd-us.com

Reed Brodsky (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel:   212.351.5334
rbrodsky@gibsondunn.com

*Attorneys for Defendant Armstrong World Industries, Inc.*

Dated: March 14, 2019

Defendant Armstrong World Industries, Inc. ("Armstrong") by and through its undersigned counsel, hereby submits its objections to Plaintiff Roxul USA, Inc's ("Rockfon") proposed jury instructions. Armstrong reserves the right to submit additional objections on any pertinent issue if the need arises. Armstrong's objections are made without waiving or intending to waive any objection(s).

Armstrong objects in general to Rockfon's proposed instructions to the extent they fail to address several key issues in the case that are relevant to the jury's assessment of Rockfon's claims. First, Rockfon's proposed instructions fail to specify that Rockfon is not pursuing a claim for conduct prior to September 1, 2013, despite the fact that the Court struck Armstrong's statute of limitations defense based on Rockfon's representation to that effect to the Court at the initial pretrial conference. *See* D.I. 25 at 1; D.I. 293 at 4 (providing instruction on this issue). Armstrong objects to this omission, and to the absence of an instruction expressing the substance of Armstrong's proposed instruction 3.

Second, Rockfon's proposed instructions fail to include a proposed instruction defining for the jury what constitutes an exclusive dealing arrangement, which is plainly a disputed issue in the case. *See* D.I. 293 at 5 (providing instruction on this issue). Armstrong objects to this omission, and to the absence of an instruction expressing the substance of Armstrong's proposed instruction 4.

Third, Rockfon's proposed instructions do not contain an instruction informing the jury how an "agreement" is defined under the antitrust laws. D.I. 293 at 40 (providing instruction on this issue). Armstrong objects to this omission, and to the absence of an instruction expressing the substance of Armstrong's proposed instruction 24.

Fourth, Rockfon's proposed instructions fail to include a proposed instruction regarding

mitigation of damages.  D.I. 293 at 54-55 (providing instruction on this issue).  Armstrong objects to this omission, and to the absence of an instruction expressing the substance of Armstrong's proposed instruction 33.

Fifth, Rockfon's proposed instructions fail to include a proposed instruction explaining to the jury the concept of selection bias, which is plainly a significant issue in this case, particularly with regards to the testimony of plaintiff's expert Einer Elhauge.  D.I. 293 at 56.  Armstrong objects to this omission, and to the absence of an instruction expressing the substance of Armstrong's proposed instruction 34.

Armstrong sets forth below its specific objections to Rockfon's proposed instructions. Each of Rockfon's proposed instructions is reproduced in italics for ease of reference, followed by Armstrong's objections, if any.

### *Rockfon's Proposed Instruction No. 1 – The Parties' Contentions*

*Plaintiff Rockfon filed this lawsuit against Defendant Armstrong for alleged antitrust violations. Rockfon alleges that Armstrong's exclusivity arrangements and territorial restraints, coupled with its dominant market position, violate federal antitrust law. Rockfon claims that Armstrong's exclusivity arrangements—many of which include the "No Rockfon" Clause— unfairly harm competition by prohibiting customers from selling Rockfon ceiling tile products to end-users anywhere in the United States Rockfon brings three specific claims against Armstrong: (1) monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) concerted action in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.*

*Armstrong denies these allegations. Armstrong contends that it has not restrained trade or unlawfully maintained a monopoly. Further, Armstrong contends that its exclusive dealing*

*arrangements did not substantially foreclose competition or result in harm to competition, did not cause injury to Rockfon, and did not cause any alleged damages. Armstrong contends that its exclusivity arrangements were procompetitive in nature.*

### Armstrong's Objections

Armstrong objects to this proposed instruction to the extent that it characterizes the challenged terms of Armstrong's distribution agreements as "exclusivity arrangements" or "exclusive dealing arrangements."   Armstrong disputes whether certain contractual terms challenged by Rockfon are exclusivity or exclusive dealing arrangements, *see, e.g.*, D.I. 237 at 12-14, and therefore this proposed instruction is argumentative, one-sided, unbalanced, and unfairly prejudicial.  *See United States v. Hart*, 273 F.3d 363, 373 (3d Cir. 2001) (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Tomasso v. Boeing Co.*, Civil Action No. 03-4220, 2007 WL 2458557, at *4 n.4 (E.D. Pa. Aug. 24, 2007) ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *United States v. Matias*, 836 F.2d 744, 750 (2d Cir. 1988))).  Armstrong similarly objects to this proposed instruction's reference to Armstrong's "dominant market position."   Armstrong disputes that it has a "dominant market position," and it would be argumentative, one-sided, unbalanced, and unfairly prejudicial to instruct the jury otherwise.

Armstrong further objects to this proposed instruction to the extent it refers to allegations that Armstrong's "territorial restraints" violate antitrust law.  Rockfon has not pled any such allegation, *see* D.I. 1, and therefore this proposed instruction is irrelevant, prejudicial, and likely to confuse or mislead the jury about what conduct is at issue.

Armstrong further objects to this proposed instruction's use of the phrase "'No Rockfon'

Clause," as prejudicial and likely to confuse the jury.

### *Rockfon's Proposed Instruction No. 2 – The Purpose of the Antitrust Laws*

*The primary purpose of the antitrust laws is to preserve and promote our system of free and open competition and to secure everyone an equal opportunity to engage in business, trade, and commerce, by preventing unreasonable restraint or monopolization of any business or industry so that the consuming public may receive better goods and services at lower cost. The Sherman Act, specifically, rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress. The law directs itself not against conduct that is competitive, even severely so, but against conduct that unfairly tends to destroy competition itself. The antitrust laws are geared toward protecting the consumer, and you should keep that in mind as you hear evidence about the alleged antitrust violations.*

### Armstrong's Objections

Armstrong objects to this proposed instruction's statement that the primary purpose of the antitrust laws is to "secure everyone an equal opportunity to engage in business, trade, and commerce," because it is an inaccurate statement of the law. The antitrust laws protect competition, not individual competitors. *Philadelphia Taxi Assoc. Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018) ("[T]he principle underlying antitrust laws" is "to protect *competition*, not *competitors*."). Likewise, Armstrong objects to the proposed instruction's failure to inform the jury that the antitrust laws are intended to protect competition, not individual competitors. *See* D.I. 293 at 3 (providing instruction on this issue). Armstrong also objects to the proposed instruction's failure to inform the jury that a desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not unlawful; that the antitrust laws do not prohibit, without more, colorful, vigorous or aggressive language; and that

the law does not require polite or "commercially correct" speech within corporate memoranda and business plans. *See id.*; *GN Netcom, Inc. v. Plantronics, Inc.*, No. 1:12-cv-1318 LPS (D. Del. Oct. 18, 2017) (Jury Instructions) (Instruction 18). These are correct statements of the law, *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 119, 1199 (3d Cir. 1995) ("The antitrust statutes do not condemn, without more, such colorful, vigorous hyperbole; there is nothing to gain by using the law to mandate 'commercially correct' speech within corporate memoranda and business plans. Isolated and unrelated snippets of such language 'provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition." (quoting Morgan v. Ponder, 892 F.2d 1355, 1359 (8th Cir. 1989)); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595-96 (7th Cir. 1984) ("We attach rather little weight to internal company documents used to show anticompetitive intent, because, though they sometimes dazzle a jury, they cast only a dim light on what ought to be the central question in an antitrust case: actual or probable anticompetitive effect."), and are necessary to ensure a fair and balanced presentation of the law to the jury in light of the disputed issues in this case.

### *Rockfon's Proposed Instruction No. 3 – Private Actions Under the Antitrust Laws*

*Rockfon's lawsuit is known as a private antitrust action. Private antitrust actions are a means of enforcing the antitrust laws, because they serve to deter defendants who have violated the antitrust laws from violating the law in the future.*

### Armstrong's Objections

Armstrong objects to this proposed instruction as argumentative, one-sided, unbalanced, unfairly prejudicial, irrelevant, and likely to confuse or mislead the jury. This proposed instruction does not bear on any of Rockfon's claims and would only serve to prejudice the jury against Armstrong.

Armstrong further objects to this proposed instruction's reference to private antitrust

actions "deter[ring] defendants who have violated the antitrust laws from violating the law in the future." The only mechanism through which private antitrust actions achieve deterrence is through treble damages. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators."). Armstrong therefore objects to this instruction as incomplete and tending to mislead the jury regarding the proper role of antitrust damages, unless Rockfon agrees to instruct the jury that any damages it awarded would be trebled.

Reserving its objections to this proposed instruction, Armstrong also contends in the alternative that if the Court were to give this instruction, Armstrong would be entitled to a countervailing statement that private antitrust actions are also sometimes brought by weak, inefficient, or unsuccessful competitors in an attempt to undermine the competitive efforts and successes of more effective or efficient rivals, which is contrary to the purposes of the antitrust laws. *See City of Pittsburgh v. West Penn Power. Co.*, 147 F.3d 256, 264 (3d Cir. 1998) ("[I]n the context of the antitrust laws . . . a balance must be struck between encouraging private actions and deterring legitimate competitive activity through overly vigorous enforcement . . . [W]e must remain mindful of the purposes and goals of the antitrust laws at issue—to preserve and promote competition."); *Capital Imaging Assoc. v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 539 (2d Cir. 1993) ("Antitrust law is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it."); *see also Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions"

6

(citing *United States v. Matias*, 836 F.2d 744, 750 (2d Cir. 1988)).

### *Rockfon's Proposed Instruction No. 4 – Common Elements and Concepts – Overview*

I will now turn to the portion of my instructions that will guide you in assessing  Plaintiff's claims and applying the law to the facts you find. Because Plaintiff's claims have certain overlapping components, I am going to first instruct you on concepts that may appear as "common elements" or "common concepts" so that you have the information you need in one place.

### Armstrong's Objections

Armstrong does not object to this proposed instruction.

### *Rockfon's Proposed Instruction No. 5 – Common Element – Interstate or Foreign Commerce*

Antitrust law applies only to conduct or restraints that affect interstate commerce. In this case, Rockfon contends that Armstrong's conduct affects interstate commerce. Interstate commerce refers to transactions in goods or services between one or more persons in one state and one or more persons in another state.

To affect interstate commerce, it is not necessary that Defendant's conduct itself occur in multiple states or directly affect transactions that span across multiple states. It is enough if  some activities of Armstrong that were affected by the conduct had some effect on interstate commerce.

### Armstrong's Objections

Armstrong objects to this proposed instruction as unnecessary and likely to confuse or mislead the jury to the extent it suggests that this issue is disputed and purports to inform the jury regarding the test for resolving it, because the parties in this case agree that Armstrong's conduct affects interstate commerce.

### *Rockfon's Proposed Instruction No. 6 – Common Element – Relevant Market in General*

You will see that each of Rockfon's claims requires you to analyze whether the accused conduct had anticompetitive effects. These effects must occur with respect to a relevant market;

*Rockfon must prove the relevant market(s) by a preponderance of the evidence.*

*There are two aspects you must consider in determining whether Rockfon has met its burden to prove the relevant market(s). The first is the relevant product market. The second is  the relevant geographic market.*

**<u>Armstrong's Objections</u>**

Armstrong objects to this proposed instruction as unnecessary and likely to confuse or mislead the jury to the extent it suggests that this issue is disputed and purports to inform the jury regarding the test for resolving it, because the parties in this case agree that the relevant geographic market is the United States, and that the relevant product market is the market for suspended acoustical ceiling tiles.

**<u>*Rockfon's Proposed Instruction No. 7 – Common Element – Relevant Geographic Market*</u>**

*The relevant geographic market is the area in which Rockfon and Armstrong face competition from other firms that compete in the relevant product market, and where customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as nationwide or as small as a single town or neighborhood.*

*Rockfon has the burden of proving the relevant geographic market by a preponderance of the evidence. In this case, Rockfon claims that the relevant geographic market is the United States. In determining whether Rockfon has met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including, but not limited to:*

- *The geographic area in which Rockfon and Armstrong sell and where their customers are located;*

- *The geographic area to which customers have turned, or have seriously considered turning to, for supply;*

- *The transportation cost differences between the areas;*

- *The geographic areas that suppliers view as potential sources of competition; and*

- *Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.*

**Armstrong's Objections**

Armstrong objects to all but the first two sentences of this proposed instruction as unnecessary and likely to confuse or mislead the jury to the extent it suggests that this issue is disputed and purports to inform the jury regarding the test for resolving it, because the parties in this case agree that the relevant geographic market is the United States.

Armstrong further objects to this proposed instruction's statement that "[t]he geographic market may be . . . as small as a single town or neighborhood," as prejudicial and likely to confuse the jury.  At the March 5, 2019 hearing, Rockfon "stipulated that that's not our case" and stated: "[w]e're not trying to base an independent claim on any of [Armstrong's] regional submarkets."  D.I. 278.

### *Rockfon's Proposed Instruction No. 8 – Common Element – Relevant Product Market*

*Rockfon must prove, by a preponderance of the evidence, the existence of a relevant product market. The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view – that is, the products compete with each other.  In other words, the relevant product market includes the products that  a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers.*

9

*Products need not be identical or precisely interchangeable so long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material such as aluminum foil, cellophane, or even plastic containers - to be reasonable alternatives, then all those products would be in the same relevant product market.*

*To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant permanent increase in price is approximately a 5% increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.*

*In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and the sales of another; (3) the presence or absence of specialized vendors; (4) the perceptions of either the industry or the public as to whether the products are in separate markets; (5) the views of Rockfon and Armstrong regarding which products compete against each other; (6) the existence or absence of different customer groups or distribution channels; (7) disadvantages to using other products that might deter customers from substituting to products outside of the market; and (8) differences in prices for particular products.*

*In this case, Rockfon contends that the relevant product market is the market for standard acoustical ceiling tiles.  Armstrong does not contend otherwise.*

## Armstrong's Objections

Armstrong objects to all but the first two paragraphs of this proposed instruction as unnecessary and likely to confuse or mislead the jury to the extent it suggests that this issue is disputed and purports to inform the jury regarding the test for resolving it, because the parties in this case agree that the relevant product market is the market for suspended acoustical ceiling tiles.

Armstrong further objects to this proposed instruction's use of the term "standard" acoustical ceiling tiles.  Rockfon has never before used the term "standard acoustical ceiling tiles," and it is unclear what this proposed instruction is referring to when it uses this term.  Rockfon's own expert Einer Elhauge asserted that the relevant product market was "suspended acoustical ceiling tiles" not "standard acoustical ceiling tiles."  *See, e.g.*, JA06718 (Elhauge Opening Rep.) ¶ 3 ("The relevant product market consists of all suspended acoustical ceiling tiles").

### *Rockfon's Proposed Instruction No. 9 – Common Concept – Market Power*

*In determining if Armstrong's alleged restraints substantially harmed competition, you should consider whether Armstrong had market power.*

*Market power is defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.*

*In determining whether Armstrong has market power, you may consider Armstrong's share or portion of the relevant market; that is, its percentage of the products or services sold in the relevant market by all competitors. The mere possession of market power is not unreasonable or*

*illegal. If you find that Armstrong possesses market power, you must still consider other elements of Rockfon's claims that I will discuss further below.*

*Factors you may consider in determining whether Armstrong has market power include whether there are any durable barriers to entry by new firms in the market, and evidence concerning the intensity of competition within that market. In addition, if you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power Defendant might otherwise have. If a plaintiff cannot show that a defendant had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that the defendant lacks market power. You should consider whether the process in which Armstrong secured exclusive contracts itself involved competition.*

### Armstrong's Objections

Armstrong objects to this proposed instruction as an incorrect statement of the law, because it fails to state that Rockfon must show "significant" market power. *ZF Meritor*, 696 F.3d 254, 271 (3d Cir. 2012) ("[M]odern antitrust law generally requires a showing of significant market power by the defendant").

Armstrong further objects to this proposed instruction as an inaccurate and incomplete statement of the law due to its failure to instruct the jury that market share only indicates market power when sales reflect the ability to curtail total market output. *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992) ("'[M]arket share indicates market power only when sales reflect control of the productive assets in the business . . . [and thus] ability to curtail total market output'" (quoting *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989))); *see Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be

argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750)); *see* D.I. 293 at 10 (providing instruction on this issue).

Armstrong further objects to this proposed instruction as an inaccurate and incomplete statement of the law due to its failure to instruct the jury that significant market power is something less than monopoly power. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); *see* D.I. 293 at 10 (providing instruction on this issue).

Armstrong further objects to this proposed instruction as an inaccurate and incomplete statement of the law due to its failure to instruct the jury that evidence of actual entry into the market may be an indication that the market lacks barriers to entry. *Philadelphia Taxi*, 886 F.3d at 342, 342 n.6 (referring to "historical evidence of entry" and concluding that "easy entry into the market is indicative that the market lacks barriers to entry"); *see* D.I. 293 at 10 (providing instruction on this issue).

Armstrong further objects to this proposed instruction as an inaccurate and incomplete statement of the law because it fails to instruct the jury that Rockfon is *required* to prove significant market power in order to succeed on its claims. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (rule of reason requires proof of "market power and market structure . . . to assess the [restraint]'s actual effect on competition." (internal quotation marks omitted)); *id.* at 2285 n.7 ("'[T]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power.'" (quoting Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 160 (1984))); *ZF Meritor*, 696 F.3d at 271 ("[M]odern antitrust law generally requires a showing of significant market power by the defendant"); *see* D.I. 293 at 11 (providing

instruction on this issue).

Armstrong further objects to this proposed instruction's use of the term "restraint," as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's minimum purchase agreements, and misleadingly implies that the challenged terms restrain competition, which is a disputed issue in the case rather than an objective fact.

### *Rockfon's Proposed Instruction No. 10 – Common Concept – Foreclosure*

*Foreclosure means that rivals are prevented from competing for an account. Total foreclosure is not required for the restraints at issue to be unlawful, nor is complete exclusivity required with each customer. In determining whether the accused conduct foreclosed competition on the merits, it is also relevant to consider the percentage of the market foreclosed. Where the exclusive dealing arrangements foreclosed more than 50 percent of the market, this is an indicator that the harm from the foreclosure of competition could be substantial. Where the exclusive dealing arrangements foreclose less than 20 percent of the market, this tends to indicate that the harm from the foreclosure of competition is not substantial because alternatives are available.*

*Foreclosure is considered substantial only when it weakens competitors to such an extent that the competitors cannot constrain the power of the defendant, here Armstrong, to raise prices, lessen buying options, restrict output, or lessen quality. If there are sufficient alternative ways for competing suppliers to effectively reach end users with their products, then a restraint does not foreclose competitors' access to the market.*

### **Armstrong's Objections**

Armstrong objects to this proposed instruction as an inaccurate and incomplete statement of the law on several key issues.  *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *United States v. Davis*, 183 F.3d 231, 250

(3d Cir. 1999) ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."). *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 134 (3d Cir. 1983) ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson v. Walsh Const. Co.*, 334 F.2d 334, 338 (3d Cir. 1964) ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji v. North East Auto Marine Terminal*, 297 F. App'x 142, 145 (3d Cir. 2008) ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Specifically, Armstrong objects to this proposed instruction as an inaccurate and incomplete statement of the law that is likely to mislead the jury to the extent that it fails to instruct the jury that, under the rule of reason, Rockfon *must* first prove that the challenged terms of Armstrong's distribution agreements substantially foreclosed competition in the relevant market. *ZF Meritor*, 696 F.3d at 271-72 ("Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason," and "modern antitrust law generally requires a showing of significant market power by the defendant, substantial foreclosure, . . . and an analysis of likely or anticompetitive effects considered in light of any procompetitive benefits."); *GN Netcom, Inc. v. Plantronics, Inc.*, 278 F. Supp. 3d 824, 828 n.2 (D. Del. 2017) ("The Court further held, in this particular case, GN 'is going to have to show substantial foreclosure in the relevant market based on the defendant's conduct . . ..'"). Relatedly, Armstrong objects to Rockfon's placement of the "Foreclosure" instruction prior to the "Rule of Reason" instruction, which is likely to mislead the jury regarding the relationship between the substantial

foreclosure requirement and the rule of reason test.

Armstrong further objects to Rockfon's proposed instruction because it fails to instruct the jury regarding important aspects of the applicable legal test for substantial foreclosure in the Third Circuit, including that "the challenged practices must bar a substantial number of rivals or severely restrict the market's ambit." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016).  In describing foreclosure percentages, Rockfon's proposed instruction also misstates the law and tends to mislead the jury by erroneously suggesting that foreclosure must be below 20 percent before it will tend to indicate that the harm from foreclosure is not substantial, and erroneously fails to instruct the jury that "foreclosure of 40% to 50% is usually required to establish an exclusive dealing violation." *ZF Meritor,* 696 F.3d at 286 (citing  *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003)).  Furthermore, Rockfon's proposed instruction is an incomplete statement of the law to the extent it fails to inform the jury that, "[i]n analyzing the amount of foreclosure, our concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer,"  *Eisai*, 821 F.3d at 403, and that substantial foreclosure occurs when rivals are prevented "from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor*, 696 F.3d at 286.

Armstrong also objects to this proposed instruction because it fails to instruct the jury regarding the important legal principles that competition is not foreclosed when end-users are free to switch to a different product in the marketplace, but choose not to do so, and accordingly that in circumstances where architects make the ultimate decision of which product to specify for use in a particular project, competition for specification by architects is classic competition on the merits of a product—a key issue in a case such as this where there are no allegations that Armstrong had exclusive dealing contracts with architects who specify the products or with contractors who

purchase the products for jobs.  *See Eisai*, 821 F.3d at 403-04 ("In analyzing the amount of foreclosure, our concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer.  For example, if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share.  One competitor's inability to compete does not automatically mean competition has been foreclosed.") (footnotes omitted); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 78 (3d Cir. 2010) ("[T]here was no restraint where the decision to choose a product was in the hands of the decision-maker (i.e., the architects) for the consumer" (citing *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005))); *Santana Prods.*, 401 F.3d at 133 ("Unlike cases where the alleged exclusionary conduct leaves the consumer with no input whatever, the decision to specify 'was always ultimately in the hands of the consumer.'  There was no evidence that the defendant prevented the plaintiff from 'pushing its arguments at the specifications phase.'  Accordingly, the plaintiff was not excluded from competition." (quoting *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 525 (5th Cir. 1999))); *id.* ("Here, the defendants' marketing campaign was aimed primarily at persuading government architects to specify [its products] . . . It was the architects who would make the ultimate decision of which product to specify for use in a particular project.  This is classic competition on the merits of a product.  In no real sense is [plaintiff] excluded from the [relevant] market.").

Rockfon's proposed instruction is also an inaccurate and incomplete statement of the law to the extent that it fails to instruct the jury that it should only consider whether the practices challenged by Rockfon foreclosed the market, and should therefore not consider any foreclosure caused by other competitors in the market or by other Armstrong conduct that is not alleged to

violate the antitrust laws. *Eisai*, 821 F.3d at 403 ("[C]hallenged practices must 'bar a substantial number of rivals or severely restrict the market's ambit.'" (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005))); *GN Netcom*, 278 F. Supp. 3d at 828 n.2 ("The Court further held, in this particular case, GN 'is going to have to show substantial foreclosure in the relevant market based on the defendant's conduct . . ..'").

Armstrong also objects to this proposed instruction as an inaccurate and incomplete statement of the law to the extent that it fails to instruct the jury that sales are not foreclosed by Armstrong's distribution agreements if they are sales that competitors are unable to compete for regardless of the existence of the challenged terms of Armstrong's distribution agreements. *Eisai*, 821 F.3d  at 403 ("[C]hallenged practices must 'bar a substantial number of rivals or severely restrict the market's ambit.'" (quoting *Dentsply*, 399 F.3d at 191)); *GN Netcom*, 278 F. Supp. 3d at 828 ("Substantial foreclosure occurs when the 'challenged practices ... severely restrict the market's ambit.'") (citation omitted); *see also University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 346-47 (2013) ("[A]n action 'is not regarded as a cause of an event if the particular event would have occurred without it.' . . . This, then, is the background against which Congress legislated . . ., and these are the default rules it is presumed to have incorporated, absent an indication to the contrary in the statute itself.").

Armstrong further objects to this proposed instruction for failing to instruct the jury that competition is not foreclosed if competitors have significant access to viable distribution channels but merely lack access to the best or most efficient distributors due to Armstrong's distribution agreements.  D.I. 275 at 13 ("We ask not whether alternative channels exist, but whether such channels are 'viable'" (quoting *GN Netcom,*, 278 F. Supp. 3d at 829 ); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("[T]he antitrust laws were not designed to

equip [Rockfon] with [Armstrong's] legitimate competitive advantage."); *id*. ("Competitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors.  Antitrust laws require no more."); *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983) ("[A] defendant, having succeeded in legitimately controlling 'the best, most efficient and cheapest source of supply,' . . . does not have to share 'the fruits of its superior acumen and industry.'").

Armstrong also objects to this proposed instruction as an inaccurate and incomplete statement of the law because it fails to instruct the jury that a defendant's challenged ability to operate at a lower cost is not anticompetitive, that running a business with greater economic efficiency is to be encouraged, and therefore that foreclosure resulting from cost reductions is not an antitrust concern.  *Philadelphia Taxi Assoc., Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018) (defendant's challenged "ability to operate at a lower cost is not anticompetitive. Running a business with greater economic efficiency is to be encouraged, because that often translates to enhanced competition among market players, better products, and lower prices for consumers"); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802a ("[I]t is not antitrust's purpose to interfere with arrangements that lower a firm's costs, even if the impact of reduced costs is to exclude those unable to match the cost reductions.  Any foreclosure resulting from cost reduction itself is not an antitrust concern").

Armstrong further objects to this proposed instruction's use of the term "restraints" in the first sentence as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's minimum purchase agreements, and misleadingly implies that the challenged terms restraint competition, which is a disputed issue in the case rather than an objective fact.

## *Rockfon's Proposed Instruction No. 11 – Common Concept – Rule of Reason*

*In this case, Rockfon claims that Armstrong's exclusive dealing arrangements constitute unreasonable restraints of trade that resulted in an adverse effect on competition under Section 1 of the Sherman Act and Section 3 of the Clayton Act. It is your job to determine whether the alleged restraints challenged here are unreasonable under what is known as the "rule of reason." A restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether the alleged restraints challenged here are unreasonable restraints of trade. In making this determination, you must first determine whether Rockfon has proven that the challenged restraints resulted in a substantial harm to competition in the relevant markets.*

*If you find that Rockfon has proven that the challenged restraints resulted in a substantial harm to competition in the relevant markets, then you must consider whether the restraints produced countervailing competitive benefits. If you find that they did, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal only if you find that the competitive harm outweighs the competitive benefit.*

## Armstrong's Objections

Armstrong objects to this proposed instruction to the extent that it characterizes the challenged terms of Armstrong's distribution agreements as "exclusive dealing arrangements." Armstrong disputes whether certain contractual terms challenged by Rockfon are exclusive dealing arrangements, *See, e.g.*, D.I. 237 at 12-14, and therefore this proposed instruction is argumentative, one-sided, unbalanced, and unfairly prejudicial. *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); Tomasso, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided" (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750)).

Armstrong objects to this proposed instruction's statement that the jury "must first determine whether Rockfon has proven that the challenged restraints resulted in substantial harm to competition in the relevant markets" as an inaccurate and incomplete statement of the law that is likely to mislead the jury to the extent that it fails to instruct the jury that, under the rule of reason, Rockfon must first prove that the challenged terms of Armstrong's distribution agreements substantially foreclosed competition in the relevant market. *ZF Meritor*, 696 F.3d at 271-72 ("[M]odern antitrust law generally requires a showing of significant market power by the defendant, substantial foreclosure, . . . and an analysis of likely or anticompetitive effects considered in light of any procompetitive benefits."); *GN Netcom*, 278 F. Supp. 3d at 828 n.2 ("The [c]ourt further held, in this particular case, GN 'is going to have to show substantial foreclosure in the relevant market based on the defendant's conduct ….'").

Armstrong further objects to this proposed instruction as an inaccurate statement of law likely to mislead the jury, to the extent it fails to inform the jury that, under the rule of reason, the challenged conduct is only illegal if the jury finds that the competitive harm "substantially outweighs" the competitive benefits. *See* ABA Model Jury Instructions in Civil Antitrust Cases, Sherman Act – General, Instruction 3C; *Mastercard Int'l Inc. v. Witter*, 1993 WL 338213, at *3 (S.D.N.Y. Aug. 27, 1993) ("A restraint of trade is unreasonable if it substantially harms competition in the relevant market to the extent that the harmful effects substantially outweigh any beneficial effects"); *see also Eisai*, 821 F.3d at 403 (exclusive dealing agreements are only illegal under the rule of reason if they "substantially lessen competition").

Armstrong also objects to this proposed instruction's use of the plural term "relevant markets," because Rockfon has stipulated that it is not pursuing any claim based on regional submarkets. D.I. 278 (Rockfon "stipulat[ing] that that's not our case" and stating "[w]e're not

trying to base an independent claim on any of [Armstrong's] regional submarkets.").   It is undisputed that the only relevant market in this case is the United States market for suspended acoustical ceiling tile, and it is misleading and unfairly prejudicial to confuse that issue in this proposed instruction.

Armstrong further objects to this proposed instruction as prejudicial and likely to confuse the jury, because it directs the jury to assess the legality of what Rockfon alleges are exclusive dealing arrangements but fails to cross-reference an instruction defining for the jury what constitutes an exclusive dealing arrangement.   Armstrong disputes whether certain contractual terms challenged by Rockfon are exclusive dealing arrangements, *see, e.g.*, D.I. 237 at 12-14, and therefore this proposed instruction's failure to direct the jury to a valid definition of what constitutes an exclusive dealing arrangement—and therefore what conduct the jury should apply the rule of reason to—is prejudicial and likely to confuse the jury.

Armstrong also objects to this proposed instruction's use of the term "restraints," as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's minimum purchase agreements, and misleadingly implies that the challenged terms restraint competition, which is a disputed issue in the case rather than an objective fact.

### *Rockfon's Proposed Instruction No. 12 – Common Concept – Rule of Reason – Proof of Competitive Harm*

As I mentioned, in order to prove that a challenged restraint is unreasonable, Rockfon first must demonstrate that the restraint has resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of Rockfon is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor does not necessarily mean that there has been harm to competition.

*A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, more product options, increased output, and higher product quality. If the challenged conduct did not or has not resulted in higher prices, less product choices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm and you should find that the challenged conduct was not unreasonable.*

*In determining whether the challenged restraint produced competitive harm, you may look at the following factors:*

- *the effect of the restraint on prices, output, product quality, and service;*

- *the purpose and nature of the restraint;*

- *the nature and structure of the relevant market, both before and after the restraint was imposed;*

- *the number of competitors in the relevant market and the level of competition among them;*

- *whether new competitors entered the market, both before and after the restraint was imposed;*

- *whether the restraint targeted a new market entrant; and*

- *whether Armstrong possesses market power.*

*To determine whether the accused conduct had a substantial harmful effect on competition, you should consider, with respect to the relevant markets: the nature and history of the use of exclusive dealing contracts in the relevant market; whether distributors and resellers had independent reasons for entering into exclusive dealing contracts or were coerced into entering into them; whether other competing suppliers also offered exclusive contracts; the extent of*

*competition among competing suppliers for exclusive contracts with buyers; Armstrong's position in the relevant market; the competitive alternatives to Armstrong's products or services; the reasons Armstrong and the distributors entered into the exclusivity agreements at issue; the effect of the use of exclusive dealing contracts on the ability of new firms to enter the relevant market and on price and other competition in the relevant market; as well as Armstrong's market power.*

*In determining the extent to which the challenged restraint(s) foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing arrangements foreclose more than 50 percent of the market, this is an indicator that the harm from the foreclosure of competition is substantial. Where the exclusive dealing arrangements foreclose less than 20 percent of the market, this is an indicator that the harm from the foreclosure of competition is not substantial because there are alternatives available. However, these are simply factors for you to consider – they are not dispositive. In the end, the key question is whether it was practical for the distributors to terminate the exclusive dealing arrangement with Armstrong, and if it was not, whether the coercion to exclusively deal with Armstrong foreclosed a substantial share of the relevant market such that competition was harmed.*

*Similarly, the ability of new competitors to enter the market is relevant to the issue of competitive harm. For example, suppose an established manufacturer that long held a dominant position is beginning to lose market share to a young rival. A set of strategically-planned exclusive dealing arrangements may slow the new entrant's expansion by forcing it to develop alternative outlets for its product, or rely on (at least temporarily), inferior or more expensive outlets. Consumer injury results from the delay the dominant firm imposes on the new rival's growth.*

*In considering all of these facts, you should determine whether the exclusive dealing*

*contract adversely affected the price paid by distributor or reseller or end-user.*

**<u>Armstrong's Objections</u>**

Armstrong objects to this proposed instruction as an inaccurate and incomplete statement of the law on several key issues and as argumentative, one-sided, unbalanced, and unfairly prejudicial. *See Hart*, 273 F.3d at 373 (3d Cir. 2001) (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it"); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))); *Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided" (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750 )).

Armstrong objects to this proposed instruction's statement that "in order to prove that a challenged restraint is unreasonable, Rockfon *first* must demonstrate that the restraint has resulted in a substantial harm to competition" (emphasis added), to the extent it tends to mislead the jury into believing that Rockfon need not first prove that the challenged terms of Armstrong's distribution agreements substantially foreclosed competition in the relevant market. *ZF Meritor*, 696 F.3d at 271-72 ("[M]odern antitrust law generally requires a showing of significant market

power by the defendant, substantial foreclosure, . . . and an analysis of likely or anticompetitive effects considered in light of any procompetitive benefits."); *GN Netcom*, 278 F. Supp. 3d at 828 n.2 ("The [c]ourt further held, in this particular case, GN 'is going to have to show substantial foreclosure in the relevant market based on the defendant's conduct. . ..'").

Armstrong further objects to this proposed instruction's failure to instruct the jury in the third paragraph that the relevant question in assessing competitive harm is whether the alleged conduct "produced *substantial* competitive harm" (emphasis added).  This proposed instruction elsewhere recognizes that Rockfon must demonstrate that Armstrong's alleged conduct resulted in *substantial* harm to competition, and that is a correct statement of law.  *See Am. Express*, 138 S. Ct. at 2284 ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework applies.  Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market"); *Eisai*, 821 F.3d at 403 (exclusive dealing arrangements are only illegal under the rule of reason if they "substantially lessen competition").  The instruction's failure to acknowledge the requirement of *substantial* harm consistently throughout is prejudicial and likely to confuse the jury.

This proposed instruction also presents an inaccurate and incomplete statement of the law to the extent that it fails to instruct the jury that it may not conclude that rising prices are proof of competitive injury unless there is also proof that output was restricted or that prices were above a competitive level, because rising prices could be equally consistent with growing product demand, and a firm's comparatively high price may simply reflect a superior product.  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing

product demand.  Under these conditions, a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level."); *Am. Express*, 138 S. Ct. at 2288; *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product.").

Armstrong further objects to the list of bullet-point factors included in this proposed instruction as unnecessary, confusing, and inaccurate statements of the law.  These factors are not the factors listed in the ABA Model Jury Instructions that Rockfon purports to rely on, nor are they supported by the case law Rockfon lists as authority for this proposed instruction.  Armstrong instead points the Court to the list of factors Armstrong presented in Instruction 12 of its proposed jury instructions, D.I. 293 at 19, which are similar to the second set of factors included by Rockfon in its proposed instruction, D.I. 298 at 15, and more accurately reflect both the binding precedent and the factors listed in the ABA Model Jury Instructions.  *See* ABA Model Jury Instructions in Civil Antitrust Cases, Sherman Act Section 1 – Vertical Restraints, Instruction 6;  *Eisai*, 821 F.3d at 407 ("While . . . [defendant's] prices were high, we have no reason to believe that [defendant's] allegedly anticompetitive conduct was the case.  In fact, [defendant's] list prices increased at a rate similar to [plaintiff's] prices . . . As a result, we find little evidence to suggest that Sanofi's practices caused or were likely to cause anticompetitive effects.").

Armstrong objects to this proposed instruction's failure to include in either its first or second set of factors a factor regarding whether Rockfon's prices increased at a similar rate to Armstrong's.  This factor is supported by the case law and relevant to Armstrong's theory of the case.  *Eisai*, 821 F.3d at 407 ("While . . . [defendant's] prices were high, we have no reason to

27

believe that [defendant's] allegedly anticompetitive conduct was the case.  In fact, [defendant's] list prices increased at a rate similar to [plaintiff's] prices . . . As a result, we find little evidence to suggest that Sanofi's practices caused or were likely to cause anticompetitive effects."); *see also Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Armstrong also objects to this proposed instruction's failure to include in either its first or second set of factors a factor regarding whether distributors had the ability to terminate the agreements.  This factor is supported by the case law and relevant to Armstrong's theory of the case.  *ZF Meritor*, 696 F.3d at 272 ("Courts will also consider . . . the ability of customers to terminate the agreements.").

Armstrong further objects to this proposed instruction's "whether the restraint targeted a new market entrant" factor as an inaccurate statement of the law that is argumentative, one-sided, unbalanced, unfairly prejudicial and likely to mislead the jury.  *See Eisai*, 821 F.3d at 398-99 ("The antitrust laws are concerned with 'the protection of competition, not competitors.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))); *id.* at 403-04 ("One competitor's inability to compete does not automatically mean competition has been foreclosed.").

Armstrong also specifically objects to the "whether Armstrong possesses market power" factor as erroneous and likely to mislead and confuse the jury, given that there is already a separate proposed instruction relating to market power and that market power is a prerequisite to liability; treating its existence as a factor in assessing harm to competition constitutes improper double counting, because it is necessarily present in any case in which harm to competition is material to determination of the defendant's liability.  Furthermore, Armstrong objects to the Rockfon's use of the term "market power" instead of "significant market power." *ZF Meritor*, 696 F.3d at 271 ("[M]odern antitrust law generally requires a showing of significant market power by the defendant").

Similarly, Armstrong objects to this proposed instruction's recitation of foreclosure percentages as duplicative and likely to confuse the jury, given that the subject of foreclosure percentage is already included in the prior proposed "Foreclosure" instruction.  Furthermore, as with Rockfon's identical coverage of this topic in its proposed "Foreclosure" instruction, in describing foreclosure percentages, this proposed instruction fails to instruct the jury that "foreclosure of 40% to 50% is usually required to establish an exclusive dealing violation." *ZF Meritor*, 696 F.3d at 286 (citing *LePage's*, 324 F.3d at 159).  Accordingly, Armstrong objects for the same reasons set forth above.  Armstrong also objects specifically to this proposed instruction's assertion that "[w]here the exclusive dealing arrangements foreclose more than 50 percent of the market, this is an indicator that the harm from the foreclosure of competition *is* substantial" (emphasis added), which is not supported by any case law cited by Rockfon.

Armstrong further objects to this proposed instruction's statement that "the key question is whether it was practical for the distributors to terminate the exclusive dealing arrangement with Armstrong, and if it was not, whether the coercion to exclusively deal with Armstrong foreclosed

a substantial share of the relevant market such that competition was harmed." This statement is argumentative, one-sided, unbalanced, unfairly prejudicial and likely to mislead the jury, particularly in its assertion that Armstrong coerced distributors to exclusively deal with Armstrong—an allegation that Armstrong vigorously contests and that is not supported by the evidence. This portion of the proposed instruction is also not supported by the case law—cited here by Rockfon, or otherwise—which does not establish that "the *key question* is whether it was *practical* for the distributors to terminate the exclusive dealing arrangement with Armstrong" (emphasis added). Indeed, in its summary judgment ruling, this Court described the questions of coercive behavior and potential termination by Armstrong's customers not as "the key question," but as permissible factors that "may" be considered, and stated that the relevant question is whether Armstrong's customers "could" terminate the agreements, not whether termination was "practical." *See* D.I. 275 at 12 (stating that "[w]e also *may* ask whether Armstrong 'engaged in coercive behavior' and whether Armstrong's customers *could* terminate the agreements" (emphasis added)).

Relatedly, Armstrong also objects to this proposed instruction's statement that "the key question is whether it was practical for the distributors to terminate the exclusive dealing arrangement with Armstrong, and if it was not, whether the coercion to exclusively deal with Armstrong foreclosed a substantial share of the relevant market such that competition was harmed" as an incorrect statement of law, unfairly prejudicial, and likely to mislead the jury. This proposed instruction suggests to the jury that it could find harm to competition if either (a) the alleged exclusive dealing arrangements were not terminable, or (b) they were terminable but they resulted in substantial foreclosure. Neither of those alternatives is a correct statement of the law. Mere lack of terminability does not itself establish harm to competition, nor does substantial foreclosure.

*See ZF Meritor*, 696 F.3d at 271-72 ("[M]odern antitrust law generally requires a showing of significant market power, substantial foreclosure, . . . and an analysis of likely or anticompetitive effects considered in light of any procompetitive benefits"); *id.* at 272 ("Courts will also consider . . . the ability of customers to terminate the agreements"); D.I. 275 at 12 ("We also *may* ask whether . . . Armstrong's customers could terminate the agreements" (emphasis added)).

Armstrong further objects to this proposed instruction to the extent that it refers to Armstrong's "exclusive dealing arrangement[s]," "exclusivity agreements," "exclusive dealing contracts," etc.  Armstrong disputes whether certain contractual terms challenged by Rockfon are exclusive dealing arrangements, *see, e.g.*, D.I. 237 at 12-14, and therefore this proposed instruction is argumentative, one-sided, unbalanced, and prejudicial.  *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); Tomasso, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750)).

Armstrong further objects to this proposed instruction's use of the term "relevant markets," because Rockfon has stipulated that it is not pursuing any claim based on regional submarkets. D.I. 278 (Rockfon "stipulat[ing] that that's not our case" and stating "[w]e're not trying to base an independent claim on any of [Armstrong's] regional submarkets.").

Armstrong also objects to this proposed instruction as argumentative, one-sided, unbalanced, unfairly prejudicial and likely to mislead and confuse the jury to the extent it includes the hypothetical contained in the second-to-last paragraph of this proposed instruction.  This hypothetical is not factually analogous to this case, and would only serve to prejudice the jury, because it would suggest to the jury that the Court has prejudged several disputed issues in the

31

case, such as whether Armstrong has "long held a dominant position" in the market, is "beginning to lose market share to a young rival," or adopted "strategically-planned exclusive dealing arrangements" to "slow the new entrant's expansion by forcing it to develop alternative outlets for its products, or rely on (at least temporarily), inferior or more exclusive outlets," whether Rockfon's growth has been delayed, and whether consumer injury has occurred.  Furthermore, the hypothetical contains inaccurate statements of law, including its assertion that competitive injury would result from a mere delay in a rival's growth.  *See, e.g.*, *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Any harmful effect on competition in the present case [from an alleged one-year delay] was, at most, temporary."); *JetAway Aviation, LLC v. Bd. of Cty. Comm'rs of Cty. of Montrose, Colo.*, 754 F.3d 824, 842 (10th Cir. 2014) ("[I]f the effect on competition is not more than temporary or 'transitory,' it is of no concern to the antitrust laws."); *see also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 251-52 (D.C. Cir. 1987).  Reserving its objections to this hypothetical, Armstrong contends in the alternative that if the Court were to include this hypothetical in its instruction, Armstrong would be entitled to a countervailing example framed in terms of its theory of the case.  *Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750).

Armstrong further objects to this proposed instruction's use of the term "restraint," as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's minimum purchase agreements, and misleadingly implies that the challenged terms restrain competition, which is a disputed issue in the case rather than an objective fact.

***Rockfon's Proposed Instruction No. 13 – Common Concept – Rule of Reason – Evidence of Competitive Benefits***

*If you find that Rockfon has proved that any of the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways. If you find that Armstrong has proved that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If Rockfon proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.*

**Armstrong's Objections**

Armstrong objects to this proposed instruction's failure to provide any examples of competitive benefits as failing to adequately instruct and inform the jury regarding the subject of competitive benefits and the relevant principles of the law that are applicable to the facts of this case and Armstrong's theory of the case.  Armstrong points the Court to the examples of competitive benefits that it provided in Instruction 13 of its proposed jury instructions, D.I. 293 at 21 ("such as enhancing efficiency; providing high volume, low transaction cost outlets for Armstrong's manufacturing capacity; enhancing business goodwill; eliminating conflicts of interest; assuring distributors make best efforts to promote and sell products; or preventing free-riding on manufacturer-supplied investments to promote rival's products"), and objects to the proposed instruction's failure to reference these potential competitive benefits, which are supported by the relevant case law and the evidence expected to be introduced at trial.  *See ZF Meritor*, 696 F.3d at 270 ("[E]xclusive dealing contracts can help prevent dealer free-riding on manufacturer-supplied investments to promote rival's products" (citing *Ryko Mfg. Co. v. Eden*

*Servs.*, 823 F.2d 1215, 1234 n. 17 (8th Cir. 1987))); *Race Tires*, 614 F.3d at 76 ("[I]t is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investments, best efforts or the like" (quoting *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004))); *Barr Labs*, 978 F.2d at 111 ("The existence of legitimate business justifications for the contracts also supports the legality of the global contracts . . . The contracts . . . proved advantageous from Abbott's perspective in terms of reaping business goodwill, and as providing high volume, low transaction cost outlets for Abbott's manufacturing capacity."); *Hendricks Music Co. v. Steinway, Inc.*, 689 F. Supp. 1501, 1513-15 (N.D. Ill. 1988) (finding procompetitive response because defendant was "wholly dependent on the efforts of its network of exclusive independent dealers to promote its name and its product line," and "allowing the existence in one dealership of two competing [brands] could create conflicts of interest within the dealership"); *see also Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Armstrong further objects to this proposed instruction's use of the term "restraint(s)," as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not

accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's minimum purchase agreements, and misleadingly implies that the challenged terms restrain competition, which is a disputed issue in the case rather than an objective fact.

### *Rockfon's Proposed Instruction No. 14 – Common Concept – Rule of Reason – Balancing the Competitive Effects*

*If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.*

*If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Rockfon bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.*

### Armstrong's Objections

Armstrong objects to this proposed instruction's use of the term "restraint," as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's minimum purchase agreements, and misleadingly implies that the challenged terms restrain competition, which is a disputed issue in the case rather than an objective fact.

### *Rockfon's Proposed Instruction No. 15 – Claims – Overview*

*Now that we have covered some of the common concepts that apply to Rockfon's claims, I am going to turn to instructing you on the specific elements of each of Rockfon's claims. For elements that are not covered by the common elements instructions above, I will provide you with*

*the information you need in the following instructions.*

**Armstrong's Objections**

Armstrong does not object to this proposed instruction.

***Rockfon's Proposed Instruction No. 16 – Sherman Act Section 1 – Unreasonable Restraint of Trade - Elements***

*Rockfon's first claim is that Armstrong's conduct unreasonably restrained trade in violation of Section 1 of the Sherman Act.*

*Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Rockfon must prove the following, by a preponderance of the evidence:*

*    **First**, the existence of a contract or combination between or among at least two separate entities;*

*    **Second**, that the contract or combination unreasonably restrained trade;*

*    **Third**, that the restraint affected interstate or foreign commerce; and,*

*    **Fourth**, that the restraint caused Rockfon to suffer an injury to its business and property.*

*    If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Armstrong and against Rockfon on this claim. If you find that Rockfon has proven each of these elements by a preponderance of the evidence, then you must find for Rockfon and against Armstrong on this claim.*

**Armstrong's Objections**

Armstrong objects to this proposed instruction as not helpful to the jury, because it is not specifically focused on the facts and claims at issue in this case.  Armstrong points the Court instead to Instruction 23 of its proposed jury instructions, D.I. 293 at 38-39, which reflect the elements of a Sherman Act Section 1 claim in the context of an exclusive dealing case.

36

Armstrong further objects to this proposed instruction as likely to confuse the jury, to the extent that it does not instruct the jury that it must apply the rule of reason to determine whether Armstrong unreasonably restrained trade. *Eisai*, 821 F.3d at 402-03 ("The applicable law is the same for each of Eisai's [Sherman Act Section 1, Sherman Act Section 2, Clayton Act Section 3, and New Jersey Antitrust Act] claims . . . [A]n exclusive arrangement . . . is . . . judged under the rule of reason."); *ZF Meritor*, 696 F.3d at 281 ("The rule of reason governs Plaintiffs' [exclusive dealing] claims under Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton Act.").

Armstrong further objects to this proposed instruction as argumentative, one-sided, unbalanced, and unfairly prejudicial to the extent it sets forth Rockfon's claim but fails to inform the jury that Armstrong denies those allegations.

Armstrong further objects to this proposed instruction as unnecessary, irrelevant, confusing, and likely to mislead the jury to the extent it identifies the question whether Armstrong's conduct affected interstate commerce as an issue to be considered by the jury, because the parties do not dispute that issue in this case.

Armstrong further objects to this proposed instruction as inaccurate, misleading, and contrary to law to the extent it fails to inform the jury that Rockfon must prove that Armstrong had significant market power as one of the prerequisites to establishing the existence of an unreasonable restraint of trade. *ZF Meritor*, 696 F.3d at 271 ("[M]odern antitrust law generally requires a showing of significant market power by the defendant").

Armstrong further objects to this proposed instruction's use of the term "restraint," as argumentative, one-sided, unbalanced, and unfairly prejudicial, because it does not accurately describe the challenged terms of Armstrong's distribution agreements, including Armstrong's

minimum purchase agreements, and misleadingly implies that the challenged terms restrain competition, which is a disputed issue in the case rather than an objective fact.

Armstrong also objects to this proposed instruction's failure to make clear the entities with which Rockfon alleges Armstrong had a "contract or combination."  Rockfon does not assert any claim for damages for any alleged contract or combination with any entity other than distributors. *See, e.g.*, JA06857-69 (Elhauge Opening Rep.) ¶¶ 238-60 (calculating damages based only on alleged agreements with distributors).  This proposed instruction's failure to make clear that Rockfon is only asserting a claim based on alleged contracts or combinations with distributors is misleading, unfairly prejudicial, and likely to confuse the jury.

### *Rockfon's Proposed Instruction No. 17 – Sherman Act Section 2 – Monopolization – Elements*

*Rockfon's second claim is that Armstrong unlawfully monopolized the U.S. market for standard acoustical ceiling tiles in violation of Section 2 of the Sherman Act. Armstrong denies these allegations.*

*To prevail on its monopolization claim, Rockfon has the burden of proving each of the following elements by a preponderance of the evidence:*

*__First__, that the alleged market is a valid antitrust market;*

*__Second__, that Armstrong possessed monopoly power in that market;*

*__Third__, that Armstrong willfully maintained monopoly power in that  market  by  engaging in anticompetitive conduct;*

*__Fourth__, that Armstrong's conduct occurred in or affected interstate and foreign commerce; and*

*__Fifth__, that Rockfon was injured in its business or property because of Armstrong's anticompetitive conduct.*

*If you find that the evidence is not sufficient to prove any one or more of these elements,*

*then you must find for Armstrong and against Rockfon on this claim. If you find that Rockfon has*

*proven each of these elements by a preponderance of the evidence, then you must find for Rockfon*

*and against Armstrong on this claim.*

**Armstrong's Objections**

Armstrong objects to the "valid antitrust market" and "interstate and foreign commerce"

elements of this proposed instruction as unnecessary, irrelevant, confusing, and likely to mislead

the jury to the extent it suggests that these issues are disputed, because the parties in this case agree

that Armstrong's conduct affects interstate commerce, that the relevant geographic market is the

United States, and that the relevant product market is suspended acoustical ceiling tiles.

Armstrong objects to this proposed instruction's use of the term "standard" acoustical

ceiling tiles. Rockfon has never before used the term "standard acoustical ceiling tiles," and it is

unclear what this proposed instruction is referring to when it uses this term. Rockfon's own expert

Einer Elhauge asserted that the relevant product market was "suspended acoustical ceiling tiles"

not "standard acoustical ceiling tiles." *See, e.g.*, JA06718 (Elhauge Opening Rep.) ¶ 3 ("The

relevant product market consists of all suspended acoustical ceiling tiles").

**_Rockfon's Proposed Instruction No. 18 – Sherman Act Section 2 – Monopolization –_**
**_Existence of Monopoly Power_**

*To prevail on its monopolization claim, Rockfon must prove by a preponderance of the*

*evidence that Armstrong had monopoly power in the relevant market. Monopoly power is the*

*power to control prices or exclude competition in a relevant antitrust market. More precisely,*

*Armstrong is a monopolist if it can profitably raise prices substantially above the competitive level*

*for a significant period of time. However, possession of monopoly power, in and of itself, is not*

*unlawful.*

The evidence presented by the parties includes evidence of Armstrong's market share, market share trends, entry and exit by other companies, and the number and size of other alleged competitors.

**Market Share**. The first factor you should consider is Armstrong's share of the relevant market(s). Based on the evidence you have heard about Armstrong's market share, you should determine its market share as a percentage of total sales in the relevant market(s). Armstrong must have a significant share of the market in order to possess monopoly power. Market share alone is not sufficient to establish monopoly power.

**Market Share Trends.** The trend in Armstrong's market share in the valid relevant market also is something you may consider. A market share that increases over time may strengthen an inference that a company has monopoly power, particularly where that company has a high market share. A decreasing market share may indicate the absence of monopoly power.

**Barriers to Entry.** You may also consider whether there are durable barriers to entry into the relevant market. Durable barriers to entry make it difficult for new competitors to enter the valid relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of high barriers to entry along with high market share may support an inference that Armstrong had monopoly power. By contrast, evidence of low or no entry barriers may be evidence that Armstrong did not have monopoly power, regardless of its market share, because new competitors could enter easily if Armstrong attempted to raise prices for a substantial period of time.

*Entry and Exit by Other Companies.* The history of entry and exit in the valid relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Armstrong lacked monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Armstrong has monopoly power.

*Number and Size of Competitors.* You may consider whether Armstrong's competitors were capable of effectively competing. In other words, you should evaluate whether the financial strength, market shares, and number of competitors in the valid relevant market acted as a check on Armstrong's ability to price its products. If Armstrong's competitors were vigorous or had large or increasing market shares, this may be evidence that Armstrong lacked monopoly power. On the other hand, if you determine that Armstrong's competitors were weak or had small or declining market shares, this may support an inference that Armstrong had monopoly power.

### Armstrong's Objections

Armstrong objects to this proposed instruction as an inaccurate and incomplete statement of the law on several key issues. *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright

& Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Armstrong objects to this proposed instruction's failure to instruct the jury that monopoly power requires the power to restrict output and that Rockfon must prove that Armstrong is able to profitably raise or maintain prices by restricting output in the relevant market. *Am. Express*, 138 S. Ct. at 2288 ("Market power is the ability to raise price profitably *by restricting output*" (quoting P. Areeda & H. Hovenkamp, *Fundamentals of Antitrust Law* § 5.01 (4th ed. 2017))); *Brooke Grp.*, 509 U.S. at 233 ("Supracompetitive pricing entails a restriction in output."); *Broadcom v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *Barr Labs.*, 978 F.2d at 112 ("'[M]arket share indicates market power only when sales reflect … ability to curtail total market output'" (quoting *Indiana Grocery*, 864 F.2d at 1414)).

Armstrong also objects to this proposed instruction's assertion that "[m]onopoly power is the power to control prices *or* exclude competition in a relevant antitrust market" (emphasis added). This is misleading and an inaccurate statement of the law. "Monopoly power is the ability to control prices *and* exclude competition in a given market." *Broadcom*, 501 F.3d at 307 (emphasis added); *Mylan Pharm. Inc. v. Warner Chilcott Public Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016) (same).

Armstrong further objects to this proposed instruction's failure to instruct the jury that monopoly power requires something greater than market power. *Eastman Kodak*, 504 U.S. at 481. The absence of such an instruction is likely to mislead or confuse the jury, especially in a case like this where both market power and monopoly power are at issue.

Armstrong objects to this proposed instruction's failure to instruct the jury that the ability to charge higher prices for better products or services is not monopoly power. *Harrison Aire*, 423 F.3d at 381 (an allegation of "supracompetitive prices" "alone does not support a reasonable

inference of monopoly power . . . a firm's comparatively high price may simply reflect a superior product."); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("[W]hen dealing with a heterogeneous product or service, a reasonable finder of fact cannot infer monopoly power just from higher prices-the difference may reflect a higher quality more costly to provide-and it is always treacherous to try to infer monopoly power from a high rate of return."); *see also Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Armstrong objects generally to this proposed instruction's failure to instruct the jury regarding several key issues relating to monopoly power, including (1) that Rockfon must prove that Armstrong has the power to maintain prices substantially above a competitive level for a significant period of time, (2) that Armstrong has the power to do so by itself, without the assistance of, and despite competition from, any existing or potential competitors, (3) that Armstrong does not have monopoly power if new competitors could enter the market or existing competitors could expand their sales such that a price increase by Armstrong would become unprofitable; and (4) the ability to earn high profit margins or a high rate of return does not necessarily mean Armstrong has monopoly power, since higher profit margins can reflect higher

quality products, low costs, or superior advertising or marketing.  *See* D.I. 293 at 25-26 (proposing instructions on these issues).

Armstrong objects to this proposed instruction's failure to instruct the jury that market share can be measured by both percentage of total quantity of ceiling tiles sold in the relevant market, and by percentage of total ceiling tile revenue in the relevant market.  This is likely to mislead or confuse the jury, especially in light of the fact that Rockfon's expert purports to measure market share using both measures.  *See, e.g.*, JA06766 (Elhauge Opening Rep.) Figures 12 & 13.

Armstrong further objects to this proposed instruction's discussion of market share as an inaccurate and incomplete statement of the law, due to its failure to instruct the jury that a market share significantly larger than 55 percent is generally required in order to establish that a defendant has monopoly power.  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201-02 (3d Cir. 1992) (stating that "[a]s a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power," and citing Judge Learned Hand's formulation "that 90% is enough, 60% is not likely to suffice, and 33% is insufficient to constitute monopoly power."); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945); *Dentsply*, 399 F.3d at 187 ("Absent other pertinent factors, a share significantly larger than 55% has been required to establish[] prima facie market power."); *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) (market share of 60% "weigh[s] heavily against" a finding of monopoly power).

Armstrong objects to this proposed instruction's discussion of market share trends.  This proposed instruction is misleading and not helpful to the jury to the extent that it fails to instruct the jury that a stable market share may indicate the absence of monopoly power.  *Barr Labs.*, 978 F.2d at 111 (the fact that defendant's market share "increased by less than 2% over the relevant

time frame . . . support[ed] the district court's conclusion that the contracts at issue did not constitute impermissible exclusive dealing arrangements.").

Armstrong objects to this proposed instruction's discussion of barriers to entry.  This proposed instruction is misleading and contrary to established precedent to the extent that it fails to instruct the jury that significant barriers to entry and barriers to expansion are a *necessary* prerequisite to concluding that a defendant has monopoly power, and therefore that if the jury concludes there are no significant barriers to entry or barriers to expansion, then it must conclude that Armstrong does not possess monopoly power, regardless of its market share.  *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("To demonstrate market power circumstantially, a plaintiff must . . . show that there are significant barriers to entry and show that existing competitors lack the capability to increase their output in the short run."); *Coastal Fuels of Puerto Rico, Inc. v Caribbean Petroleum Corp.*, 79 F.3d 182, 197 (1st Cir. 1996) (same); *Broadcom*, 501 F.3d at 307 ("To support an inference of monopoly power, a plaintiff typically must plead and prove … that significant 'entry barriers' protect that market."); *United States v. Syufy Enters.*, 903 F.2d 659, 664, 664 n.6, 671 n.21 (9th Cir. 1990) ("[A] conclusion [that defendant possesses monopoly power] normally should not be drawn where the evidence also indicates that there is no barrier to entry into the relevant market" because "[i]f there are no significant barriers to entry . . . any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less."); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (evidence of ease of entry "refutes any inference of the existence of monopoly power"); *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) (agreeing with district court's reasoning that plaintiff's Sherman Act Section 2 claim must

be dismissed for failure to alleged "necessary facts" including "barriers that exist which prevent plaintiff's entry into such markets."); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986).

Armstrong also objects to this proposed instruction's discussion of barriers to entry. This proposed instruction is misleading and contrary to established precedent to the extent that it instructs the jury that barriers to entry include "intellectual property rights (such as patents or trade secrets)." *See Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (mere fact that a product is patented does not support a presumption of market power).

Armstrong also objects to this proposed instruction's listing of "the reputation of the companies already participating in the market (or the brand name recognition of their products)" as an example of barriers to entry. This is an inaccurate statement of the law that is likely to prejudice the jury. *Advo*, 51 F.3d at 1201-02 ("Advo also emphasizes the need for a reputation for providing reliable service as a barrier to entering its business. This approach, however, proves too much. New entrants and customers in virtually any market emphasize the importance of a reputation for delivering a quality good or service . . . Advo's argument, without some limiting principle (that it fails to supply), implies that there are barriers to entry, *significant in an antitrust sense*, in all markets. We find this proposition implausible and, moreover, precluded by Supreme Court precedent."); *Syufy Enters.*, 903 F.2d at 669 ("We fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition."); *Omega*, 127 F.3d at 1164 ("We agree with the unremarkable proposition that a competitor with a proven product and strong reputation is likely to enjoy success in the marketplace, but reject the notion that this is anticompetitive. It is the essence of competition."); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d

1147, 1154 (9th Cir. 1997) ("[R]eputation alone does not constitute a sufficient entry barrier in this Circuit.").

Armstrong also objects to this proposed instruction as misleading and likely to confuse the jury, due to its failure to instruct the jury that if Armstrong does not have monopoly power, then it must find for Armstrong and against Rockfon on Rockfon's monopolization claim.

### *Rockfon's Proposed Instruction No. 19 – Sherman Act Section 2 – Monopolization – Willful Maintenance of Monopoly Power*

*The next element Rockfon must prove is that Armstrong willfully maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, which have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.*

*Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.*

*A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.*

*The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive*

*marketplace, and the antitrust laws do not make these goals — or the achievement of these goals*

*— unlawful, as long as a company does not use anticompetitive means to achieve these goals.*

*In determining whether Armstrong's conduct was anticompetitive or whether it was*

*legitimate business conduct, you should determine whether the conduct is consistent with*

*competition on the merits, whether the conduct provides benefits to consumers, and whether the*

*conduct would make business sense apart from any effect it has on excluding competition or*

*harming competitors.*

### **Armstrong's Objections**

Armstrong objects to this proposed instruction as likely to mislead or confuse the jury.

Binding precedent states that this element of Rockfon's claim must be evaluated under the rule of

reason. *Eisai*, 821 F.3d at 402-03 ("The applicable law is the same for each of Eisai's [Sherman

Act Section 1, Sherman Act Section 2, Clayton Act Section 3, and New Jersey Antitrust Act]

claims . . . [A]n exclusive arrangement . . . is . . . judged under the rule of reason.") (footnotes

omitted); *ZF Meritor*, 696 F.3d at 269 n.9, 281 ("The rule of reason governs Plaintiffs' [exclusive

dealing] claims under Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton

Act."). Even though Rockfon proposes separate instructions on the rule of reason, this proposed

instruction fails to instruct the jury to apply the rule of reason on this element, and therefore is

likely to confuse and mislead the jury as to what legal test to apply.

Armstrong also objects to this proposed instruction to the extent that it instructs the jury

that anticompetitive acts are acts that have the effect of "frustrating the efforts of other companies

to compete for customers within the relevant market." This statement is not the law, and indeed

Rockfon fails to provide any support in the case law for it. Every vigorous competitor engaged

purely in competition on the merits is attempting to "frustrat[e] the efforts of other companies to

compete for customers," so this proposed instruction sweeps far too broadly by condemning a wide array of lawful and indeed procompetitive conduct.

Relatedly, Armstrong also objects to this proposed instruction to the extent that it instructs the jury that, in determining whether Armstrong's conduct was anticompetitive, the jury should determine "whether the conduct would make business sense apart from any effect it has on . . . harming competitors." This is an inaccurate statement of law, and is therefore likely to mislead the jury. *See R.J. Reynold Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 696 (7th Cir. 2006) ("Yet as we remark frequently in antitrust litigation, 'cut-throat competition' is a term of praise rather than condemnation . . . Businesses need not love their rivals . . .; consumers gain when firms try to 'kill' the competition and take as much business as they can . . . The question is not whether the defendant has tried to knock out other businesses but whether the means it has employed to that end are likely to benefit or injure consumers."); *Energy Conversion Devices Liquidation Trust v. Trina Solar Ltd.*, 833 F.3d 680, 685 (6th Cir. 2016) ("It does not suffice for a plaintiff to allege only that the defendant has tried to knock out other businesses; the plaintiff must show that the means it has employed to that end are likely to . . . injure consumers." (internal quotation marks omitted)); *see also Eisai*, 821 F.3d at 398-99 ("The antitrust laws are concerned with 'the protection of competition, not competitors.'" (quoting *Brown Shoe*, 370 U.S. at 320)).

### *Rockfon's Proposed Instruction No. 20 – Sherman Act Section 2 – Attempted Monopolization Claim – Elements*

*Rockfon's third claim is that it was injured by Armstrong's alleged unlawful attempt to monopolize the market for standard acoustical ceiling tiles. Armstrong denies these allegations. To prevail on its claim of attempted monopolization, Rockfon has the burden of proving each of the following elements by a preponderance of the evidence:*

*First, that Armstrong engaged in anticompetitive conduct;*

49

*Second*, that Armstrong had a specific intent to achieve monopoly power in a relevant market;

*Third*, that there was a dangerous probability that Armstrong would achieve its goal of monopoly power in the relevant market;

*Fourth*, that Armstrong's conduct occurred in or affected interstate and foreign commerce; and

*Fifth*, that Rockfon was injured in its business or property by Armstrong's anticompetitive conduct.

*If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Armstrong and against Rockfon on this claim. If you find that Rockfon has proven each of these elements by a preponderance of the evidence, then you must find for Rockfon and against Armstrong on this claim.*

**Armstrong's Objections**

Armstrong objects to the "interstate and foreign commerce" element of this proposed instruction as unnecessary, irrelevant, confusing, and likely to mislead the jury to the extent it suggests that this issue is disputed, because the parties in this case agree that Armstrong's conduct affects interstate commerce.

**_Rockfon's Proposed Instruction No. 21 – Sherman Act Section 2 – Attempted Monopolization Claim – Anticompetitive Conduct_**

*It is not sufficient for Rockfon to prove that Armstrong intended to monopolize the relevant market. Rockfon must also show that Armstrong engaged in anticompetitive conduct, coupled with intent to monopolize and a dangerous probability that Defendant would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.*

*As noted above, Armstrong contends that its challenged exclusivity agreements with distributors create benefits for the market that serve as procompetitive justifications for the agreements.*

**Armstrong's Objections**

Armstrong objects to this proposed instruction as likely to mislead or confuse the jury. Binding precedent states that this element of Rockfon's claim must be evaluated under the rule of reason. *Eisai*, 821 F.3d at 402-03 (3d Cir. 2016) ("The applicable law is the same for each of Eisai's [Sherman Act Section 1, Sherman Act Section 2, Clayton Act Section 3, and New Jersey Antitrust Act] claims . . . [A]n exclusive arrangement . . . is . . . judged under the rule of reason.") (footnotes omitted); *ZF Meritor*, 696 F.3d at 269 n.9, 281 ("The rule of reason governs Plaintiffs' [exclusive dealing] claims under Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton Act."). Even though Rockfon proposes separate instructions on the rule of reason, this proposed instruction fails to instruct the jury to apply the rule of reason on this element, and therefore is likely to confuse and mislead the jury as to what legal test to apply.

**_Rockfon's Proposed Instruction No. 22 – Sherman Act Section 2 – Attempted Monopolization Claim – Specific Intent_**

*I have already instructed you as to the relevant market and anticompetitive conduct, and you should follow those instructions in analyzing Rockfon's attempted monopolization claim. I will now discuss specific intent. In order to prevail on its claim for attempted monopolization, Rockfon must prove that Armstrong had a specific intent to monopolize a relevant market.*

*There are several ways in which Rockfon may prove that Armstrong had the specific intent to monopolize. There may be evidence of direct statements of Armstrong's intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Armstrong at or about the time of the conduct in*

question or by testimony concerning statements made by responsible officers or employees of Armstrong. You must be careful, however, to distinguish between Armstrong's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decided that the evidence does not prove directly that Armstrong actually intended to obtain a monopoly, specific intent may be inferred from what Armstrong did. For example, if the evidence shows that Armstrong lacked a legitimate business justification and the natural and probable consequence of Armstrong's conduct in the relevant market was to give Armstrong control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Armstrong, then you may (but are not required to) infer that Armstrong specifically intended to acquire monopoly power.

## Armstrong's Objections

Armstrong objects to this proposed instruction to the extent that it states: "Such proof of specific intent may be established by documents prepared by responsible officers or employees of Armstrong at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Armstrong."  This language is unfairly prejudicial, likely to mislead the jury, and contrary to law.  *See Advo*, 51 F.3d at 1199 (3d Cir. 1995) ("The antitrust statutes do not condemn, without more, such colorful, vigorous hyperbole; there is nothing to gain by using the law to mandate 'commercially correct' speech within corporate memoranda and business plans.  Isolated and unrelated snippets of such language 'provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition." (quoting *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir. 1989))); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595-96 (7th Cir. 1984) ("We attach

rather little weight to internal company documents used to show anticompetitive intent, because, though they sometimes dazzle a jury, they cast only a dim light on what ought to be the central question in an antitrust case: actual or probable anticompetitive effect.").

### *Rockfon's Proposed Instruction No. 23 – Sherman Act Section 2 – Attempted Monopolization Claim – Dangerous Probability of Success*

*If you find that Armstrong had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of Rockfon's attempt to monopolize claim: namely, that there was a dangerous probability that Armstrong would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.*

*In determining whether there was a dangerous probability that Armstrong would acquire the ability to control price in the markets, you should consider such factors as:*

- *Armstrong's market share;*

- *The trend in Armstrong's market share;*

- *Whether the barriers to entry into the market made it difficult for competitors to enter the market;*

- *The strength of the competition;*

- *The probable development of the industry; and*

- *The nature and likely effect of any anticompetitive conduct on Armstrong's share of the market.*

*Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Armstrong would ultimately acquire monopoly power.*

### Armstrong's Objections

53

Armstrong objects to this proposed instruction's failure to instruct the jury that entry or exit of new competitors or expansion of competitors is a factor that the jury should consider in determining whether there was a dangerous probability that Armstrong would achieve monopoly power. *Barr Labs.*, 978 F.2d at 112-13 (affirming district court opinion that defendant did not have a dangerous probability success in achieving market power where district court relied on "the entry of new manufacturers and products"); *AD/SAT, Civ. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226-27 (2d Cir. 1999) (in order to have a dangerous probability of attaining monopoly power, defendant must have "the ability '(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion.'" (quoting 2A Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 501)); *Am. Prof'l Testing Serv.*, 108 F.3d at 1154 ("[N]either monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion."); *see also Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Armstrong further objects to this proposed instruction as confusing to the jury, due to its failure to refer the jury to a prior monopoly power instruction to help the jury evaluate this element.

Armstrong further objects to this proposed instruction as an inaccurate and incomplete statement of the law, due to its failure to instruct the jury that dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Armstrong would ultimately acquire monopoly power. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1030 (9th Cir. 1981); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 971 (8th Cir. 1968); ABA Jury Instructions in Civil Antitrust Cases, Sherman Act Section 2 – Attempt to Monopolize, Instruction 4.

### *Rockfon's Proposed Instruction No. 24 – Clayton Act Section 3 Claim – Elements*

*Rockfon's fourth claim is under Section 3 of the Clayton Act. Rockfon alleges that Armstrong used exclusive dealing arrangements with distributors to foreclose competition in a substantial portion of the relevant markets, and that Rockfon was injured as a result of these exclusive dealing arrangements. To succeed on this claim, Rockfon must prove the following four elements by a preponderance of the evidence:*

*First, that Armstrong sold standard acoustical ceiling tiles, or entered into contracts for the sale of standard acoustical ceiling tiles, for use, consumption, or resale in the United States;*

*Second, that in its sales or contracts for standard acoustical ceiling tiles, Armstrong established an agreement or understanding that the purchaser would not directly purchase, advertise, or promote Rockfon ceiling tile products;*

*Third, the effect of such sales, or contracts for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in a relevant market;*

*Fourth, Rockfon was injured in its business or property as a proximate result of Armstrong's conduct.*

Rockfon claims that, among other things, Armstrong pressured and/or threatened distributors to enter into written or verbal exclusivity agreements with Armstrong, whereby the distributors were prohibited from promoting, carrying or selling Rockfon ceiling tile products specifically. Rockfon further alleges that these exclusivity arrangements blocked Rockfon's access to standard acoustical ceiling tile end-users.

You need not find that the challenged agreements contained a specific, express agreement to use or purchase only Armstrong's products to conclude that said agreements constitute exclusive dealing arrangements because a condition, agreement or understanding may be either expressly stated or inferred from the circumstances.

You should not assume that a contract is illegal merely because it is exclusive. Exclusive agreements, in and of themselves, do not violate the antitrust laws. It is only when a monopolist employs exclusive dealing arrangements that the antitrust laws are implicated. Thus, there is no challenge to Rockfon's distribution agreements in this case, because Rockfon is not a monopolist.

Armstrong's agreements may be found to be exclusive dealing arrangements if they had the practical effect of substantially preventing the purchase of Rockfon's goods. An agreement may be an exclusive dealing arrangement even if it does not require a 100% commitment to deal only in the seller's products. You also may find that the dealing arrangement substantially lessened competition if you find that competition has been foreclosed in a substantial share of the line of commerce affected.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Armstrong and against Rockfon on this claim. If you find that Rockfon has proven each of these elements by a preponderance of the evidence, then you must find for Rockfon and against Armstrong on this claim.

**Armstrong's Objections**

Armstrong objects to this proposed instruction as unnecessarily duplicative, misleading, and likely to confuse the jury, because Rockfon's Clayton Act Section 3 claim is properly evaluated using the same legal tests as its Sherman Act Section 1 claim, and accordingly there is no need or justification for providing separate instructions detailing the elements of a Section 3 claim.

Under binding Third Circuit precedent, Rockfon's Clayton Act Section 3 claim must be evaluated under the rule of reason, just as its Sherman Act Section 1 claim must be. *Eisai*, 821 F.3d at 402 (holding that Clayton Act § 3 claim must satisfy rule of reason test); *ZF Meritor*, 696 F.3d at 281 (same); D.I. 240 at 13-14 (Rockfon stating that Clayton Act Section 3 claims are assessed under the rule of reason). This proposed instruction fails to refer the jury to the rule of reason instructions to evaluate Rockfon's Clayton Act Section 3 claim, and therefore is misleading and likely to confuse the jury.

And, contrary to Rockfon's proposed instruction, since Rockfon's Clayton Act Section 3 and Sherman Act Section 1 claims are both exclusive dealing claims, Rockfon must prove under both statutes that Armstrong entered into exclusive dealing agreements. *Eisai*, 821 F.3d at 403 (an exclusive dealing arrangement "is an express or *de facto* agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." (internal quotation marks omitted)); *ZF Meritor*, 696 F.3d at 282 ("A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing."); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 152 (4th Cir. 1990) ("Under the more prototypical § 3 claim, a seller persuades a buyer by whatever means to buy only from the seller, to the exclusion of all of the seller's competitors.").

Armstrong further objects to this proposed instruction to the extent it instructs the jury that the Rockfon must only prove "Armstrong established an agreement or understanding that the purchaser would not directly purchase, advertise, or promote Rockfon ceiling tile products" in order to establish the second element of its claim.  This is an inaccurate statement of the law regarding Rockfon's Clayton Act Section 3 claim.  As the Third Circuit has explained, exclusive dealing "is an express or de facto 'agreement in which a buyer agrees to purchase . . . only from a particular seller.'"  *Eisai*, 821 F.3d at 403 (quoting *ZF Meritor*, 696 F.3d at 270);  *see also ZF Meritor*, 696 F.3d at 282 ("A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing."); *Advanced Health-Care Servs.*, 910 F.2d at 152 ("Under the more prototypical § 3 claim, a seller persuades a buyer by whatever means to buy only from the seller, to the exclusion of all of the seller's competitors.").  Accordingly, under Clayton Act Section 3, Rockfon must prove that Armstrong entered into agreements in which the distributor(s) agreed to purchase *only from Armstrong*.

Armstrong further objects to this proposed instruction to the extent that it instructs the jury that Clayton Act Section 3 requires only that Rockfon prove that the effect of an exclusive dealing arrangement "may be" to substantially lessen competition.  This is an inaccurate statement of the law as applied to this case.  The standard articulated by this instruction is the standard that would apply if the government were suing for prospective relief.   However, Rockfon is not the government and Clayton Act Section 3 does not contain a provision for private enforcement.  *See Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987).  Therefore, Rockfon is only allowed to sue for private enforcement of Clayton Act Section 3 if it can satisfy the requirements of Clayton Act Section 4.   *See* D.I. 253 at 1 n.1 (Rockfon acknowledging this fact).  And Clayton Act Section 4 requires proof of "actual injury attributable

to something the antitrust laws were designed to prevent," rather than proof establishing "only that injury *may* result." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 561-62 (1981).

Armstrong also objects to this proposed instruction to the extent that it refers to Armstrong's "exclusivity arrangements" and "exclusive dealing arrangements." Armstrong disputes whether certain contractual terms challenged by Rockfon are exclusivity arrangements, *see, e.g.*, D.I. 237 at 12-14, and therefore this proposed instruction is prejudicial. *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Tomasso*, 2007 WL 2458557, at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *United States v. Matias*, 836 F.2d 744, 750 (2d Cir. 1988)).

Armstrong further objects to this proposed instruction's use of the term "relevant markets," because Rockfon has stipulated that it is not pursuing any claim based on regional submarkets. D.I. 278 (Rockfon "stipulat[ing] that that's not our case" and stating "[w]e're not trying to base an independent claim on any of [Armstrong's] regional submarkets.").

Armstrong further objects to this proposed instruction's recitation of Rockfon's claims (i.e., the allegations that "among other things, Armstrong pressured and/or threatened distributors to enter into written or verbal exclusivity agreements with Armstrong, whereby the distributors were prohibited from promoting, carrying or selling Rockfon ceiling tile products specifically," and that "these exclusivity arrangements blocked Rockfon's access to standard acoustical ceiling tile end-users") as argumentative, one-sided, unbalanced, and unfairly prejudicial because the proposed instruction fails to include any comparable recitation of Armstrong's contentions.

Moreover, it is unnecessarily confusing and duplicative to include an assertion of Rockfon's contentions in this proposed instruction because proposed instruction 1 already sets forth the parties' contentions.

Armstrong further objects to the first element listed in this proposed instruction as unnecessary, irrelevant, confusing, and likely to mislead the jury to the extent it suggests that those issues are disputed, because the parties in this case agree that Armstrong sold suspended acoustical ceiling tiles and entered into contracts for the sale of suspended acoustical ceiling tiles for use, consumption, or resale in the United States.

Armstrong also objects to this proposed instruction's use of the term "standard" acoustical ceiling tiles. Rockfon has never before used the term "standard acoustical ceiling tiles," and it is unclear what this proposed instruction is referring to when it uses this term. Rockfon's own expert Einer Elhauge asserted that the relevant product market was "suspended acoustical ceiling tiles" not "standard acoustical ceiling tiles." *See, e.g.*, JA06718 (Elhauge Opening Rep.) ¶ 3 ("The relevant product market consists of all suspended acoustical ceiling tiles").

### *Rockfon's Proposed Instruction No. 25 – Clayton Act Section 3 Claim – Use, Consumption or Resale in the United States*

*As to the first element of Rockfon' s Clayton Act Section 3 claim, you must determine whether Armstrong sold standard acoustical ceiling tiles, and entered into contracts for the sale of standard acoustical ceiling tiles, for use, consumption or resale in the United States.*

### Armstrong's Objections

Armstrong objects to this proposed instruction as unnecessarily duplicative, misleading, and likely to confuse the jury, because Rockfon's Clayton Act Section 3 claim is properly evaluated using the same legal tests as its Sherman Act Section 1 claim. *See supra* Armstrong's Objections to Instruction No. 24.

Armstrong further objects to this proposed instruction as unnecessary, irrelevant, confusing, and likely to mislead the jury to the extent it suggests that these issues are disputed, because the parties in this case agree that Armstrong sold suspended acoustical ceiling tiles and entered into contracts for the sale of suspended acoustical ceiling tiles for use, consumption, or resale in the United States.

Armstrong objects to this proposed instruction's use of the term "standard" acoustical ceiling tiles.  Rockfon has never before used the term "standard acoustical ceiling tiles," and it is unclear what this proposed instruction is referring to when it uses this term.  Rockfon's own expert Einer Elhauge asserted that the relevant product market was "suspended acoustical ceiling tiles" not "standard acoustical ceiling tiles."  *See, e.g.*, JA06718 (Elhauge Opening Rep.) ¶ 3 ("The relevant product market consists of all suspended acoustical ceiling tiles").

### *Rockfon's Proposed Instruction No. 26 – Injury and Causation*

*If you find that Armstrong violated Section 1 or 2 of the Sherman Act, or Section 3 of the Clayton Act, then you must decide if Rockfon has been injured by Armstrong's conduct and, if so, whether Rockfon is entitled to recover damages from Armstrong for that injury.*

*Rockfon is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:*

*__First__, that Rockfon was in fact injured as a result of Armstrong's alleged violation of the antitrust laws;*

*__Second__, that Armstrong's alleged illegal conduct was a material cause of Rockfon's injury; and*

*__Third__, that Rockfon's injuries are injuries of the type that the antitrust laws were  intended to prevent.*

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Rockfon to establish that it is entitled to recover damages, Rockfon must prove that it was injured as a result of Armstrong's violation of the antitrust laws. Proving causation does not require Rockfon to prove the precise dollar value of its injury. It requires only that Rockfon prove that it was in fact injured by Armstrong's alleged antitrust violation. If you find that Rockfon has established that it was in fact injured, you may then consider the amount of Rockfon's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Rockfon has established that it was in fact injured.

Rockfon must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that Armstrong's alleged illegal conduct was a material cause of Rockfon's injury. This means that Rockfon must prove that some damage occurred to it as a result of Armstrong's alleged antitrust violation and not some other cause. Rockfon is not required to prove that the accused conduct was the sole cause of its injury; nor need Rockfon eliminate all other possible causes of injury. It is enough if Rockfon has proven that the alleged antitrust violation materially contributed, or substantially contributed, to Rockfon's injury, even if other factors also contributed.

Finally, Rockfon must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Rockfon's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Rockfon's injuries are antitrust injuries. As an example of antitrust injury, suppose an established manufacturer that long held a dominant position is beginning to lose market share to a young rival. A set of strategically- planned exclusive

*dealing arrangements may slow the new entrant's expansion by forcing it to develop alternative outlets for its product, or rely on (at least temporarily), inferior or more expensive outlets. Antitrust injury results from the delay the dominant firm imposes on the new rival's growth.*

### Armstrong's Objections

Armstrong objects to this proposed instruction as an inaccurate and incomplete statement of the law that is likely to mislead the jury, to the extent that it fails to instruct the jury that if Rockfon's injuries were caused by something other than Armstrong's alleged antitrust violation, such as heightened competition, the competitive process itself, or by acts that would benefit consumers, then the jury must find that Rockfon failed to prove causation. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (plaintiffs must show "that defendants' wrongful acts had caused damage to plaintiffs" that was "not shown to be attributable to other causes"); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys. Inc.*, 63 F.3d 1267, 1273 (3d Cir. 1995) ("[P]laintiff must establish cognizable injury attributable to [the] antitrust violation").

Armstrong also objects to this proposed instruction as misleading and an inaccurate and incomplete statement of the law to the extent that it fails to instruct the jury that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—including where a competitor offers better products or services, where a competitor is more efficient and can charge lower prices and still earn a profit—and that the antitrust laws do not permit plaintiffs to recover damages for such losses that were caused by the competitive process or conduct that benefits consumers. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) ("[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses

stemming from continued competition."); *id.* at 344 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.").

Armstrong further objects to the purported "example of antitrust injury" Rockfon presents at the end of this proposed instruction.  This example is argumentative, one-sided, unbalanced, unfairly prejudicial, is not supported by the authorities Rockfon provides for this instruction, and ultimately appears to be based upon a passage from Areeda & Hovenkamp that is not addressing causation or antitrust injury. *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750)).  In addition, this hypothetical is not factually analogous to this case, and would only serve to prejudice the jury, because it would suggest to the jury that the Court has prejudged several disputed issues in the case, such as whether Armstrong has "long held a dominant position" in the market, is "beginning to lose market share to a young rival," or adopted "strategically-planned exclusive dealing arrangements" to "slow the new entrant's expansion by forcing it to develop alternative outlets for its products, or rely on (at least temporarily), inferior or more exclusive outlets," whether Rockfon's growth has been delayed, and whether antitrust injury has occurred.  Furthermore, the hypothetical contains inaccurate statements of law, including its assertion that antitrust injury would result from a mere delay in a rival's growth.  *See, e.g.*, *Adaptive Power Sols.*, 141 F.3d at 952 ("Any harmful effect on competition in the present case [from an alleged one-year delay] was, at most, temporary."); *JetAway Aviation*, 754 F.3d at 842 ("[I]f the effect on competition is not more than temporary or

'transitory,' it is of no concern to the antitrust laws."); *see also Williamsburg Wax Museum*, 810 F.2d at 251-52.  Reserving its objections to this hypothetical, Armstrong contends in the alternative that if the Court were to include this hypothetical in its instruction, Armstrong would be entitled to a countervailing example framed in terms of its theory of the case.  *Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750 )).

Armstrong further objects to this proposed instruction as argumentative, one-sided, unbalanced, and unfairly prejudicial to the extent it includes the statement that "[i]f Rockfon's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Rockfon's injuries are antitrust injuries," which appears to be drawn from Instruction 42 in *Plantronics*, but omits the countervailing statement from those instructions that would be necessary to ensure a balanced presentation to the jury (namely, "On the other hand, if Rockfon's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Rockfon's injuries are not antitrust injuries and Rockfon may not recover damages for those injuries under the antitrust laws.").

### Rockfon's Proposed Instruction No. 27 – Definition of Business or Property

*Rockfon must establish that the injury it claims to have suffered was an injury to its "business or property." The term "business" includes any commercial interest or venture,  and you are instructed that Rockfon has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Armstrong's alleged antitrust violation. The term "property" includes anything of value Rockfon owns, possesses, or in which Rockfon has a protectable legal interest. You are instructed that Rockfon has been injured in its*

*property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of Armstrong's alleged antitrust violation. You are further instructed to find that Rockfon has been injured in its "business or property" if you find it has lost money as a result of Armstrong's alleged antitrust violation.*

**Armstrong's Objections**

Armstrong does not object to this proposed instruction.

***Rockfon's Proposed Instruction No. 28 – Antitrust Damages – Purpose***

*If you find that Armstrong violated the antitrust laws and that this violation caused injury to Rockfon, then you must determine the amount of damages, if any, that Rockfon is entitled to recover. The law provides that Rockfon should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.*

*The purpose of awarding damages in an antitrust case is to put the injured party as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer – what we sometimes refer to as punitive damages – or to deter defendants from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. You are also not permitted to award to Rockfon an amount for attorneys' fees or the cost of maintaining this lawsuit. Antitrust damages are compensatory only. In other words, they are designed to compensate Rockfon for the particular injuries it suffered as a result of the alleged violation of the law.*

**Armstrong's Objections**

Armstrong objects to this instruction as misleading, unfairly prejudicial, and likely to confuse the jury to the extent that it fails to instruct the jury that the fact that there is an instruction

on Rockfon's damages does not mean the Court believes Rockfon should prevail in the case. Similarly, Armstrong objects to this proposed instruction as misleading, prejudicial, and likely to confuse the jury to the extent that it fails to instruct the jury that if it reaches a verdict for Armstrong on the issue of liability, it should not consider the issue of damages.

### *Rockfon's Proposed Instruction No. 29 – Antitrust Damages – Calculation*

*Damages may not be based on guesswork or speculation. If you find that a damages calculation cannot be based on evidence and reasonable inference, and instead can only be reached through guesswork or speculation, then you may not award damages.*

*You are permitted to make reasonable estimates in calculating damages. It may be difficult for you to determine the precise amount of damages suffered by Rockfon. Rockfon is given some latitude in calculating damages, so long as its theory is not wholly speculative. You are permitted to make a just and reasonable estimate of the damages. So long as there is a reasonable basis in the evidence for a damages award, Rockfon should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.*

*If you find that Rockfon has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.*

### Armstrong's Objections

Armstrong objects to this proposed instruction as misleading and confusing to the jury, because it fails to adequately instruct the jury that Rockfon bears the burden of proof in terms of damages. *See Stelwagon*, 63 F.3d at 1273 ("[A] plaintiff must prove . . . actual damage suffered."); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 484 (3d Cir. 1998) ("[P]laintiff . . . must make a showing regarding the *amount* of damages, in order to justify an award by the trier of fact.").

Armstrong further objects to this proposed instruction to the extent it instructs the jury that Rockfon is entitled to damages "so long as its theory is not *wholly* speculative" (emphasis added).

This language is not consistent with Third Circuit precedent regarding the proper method of instructing juries in antitrust cases, which does not set the bar at "wholly speculative." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) ("[T]he actual amount of damages may result from a 'reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.'" (quoting *MCI Commc's Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983))).  Rockfon cites no example of a court that has instructed a jury that it may award damages as long as they are not "wholly speculative," and any such instruction would be improper and misleading.

Armstrong also objects to this proposed instruction as an inaccurate and incomplete statement of the law, to the extent that it fails to instruct the jury that it may award compensation only for damages directly caused by conduct of the defendant that violated the antitrust laws, and may not award compensation for damages caused by legally permitted conduct of the defendant, damages caused by general conditions in the industry not attributable to illegal conduct of the defendant, or damages caused by conduct of third parties such as United States Gypsum ("USG"). *Rossi*, 156 F.3d at 483 ("It is not necessary to show with total certainty the amount of damages sustained, just that the antitrust violation caused the antitrust injury suffered by the plaintiff."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1176 ("[O]ne pursuing antitrust recovery must establish that the damages suffered were caused by the defendant's participation in a scheme repugnant to the antitrust laws"; "[w]e overturned a jury verdict when review of the evidence showed that a damage award was partially based on legally-permitted competition by the defendant"; "antitrust recovery can constitute compensation for only those damages directly caused by unlawful competition."); *id*. (upholding jury instruction stating "'To the extent that you find that any money was lost because of general conditions in the steel industry not attributable to

this conspiracy and so forth, you should, of course, not include any such sums in your calculation of damages'"); *Stelwagon*, 63 F.3d at 1273 ("[P]laintiff must establish cognizable injury attributable to [the] antitrust violation"); *MCI*, 708 F.2d at 1162 ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage."); *Coleman Motors Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) (damages must "reflect only losses due to unlawful competition" and are improper when "attributable at least in part to . . . lawful competition."); *Bigelow*, 327 U.S. at 264 (plaintiffs must show "that defendants' wrongful acts had caused damage to plaintiffs" that was "not shown to be attributable to other causes"); *Atlantic Richfield*, 495 U.S. at 344 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.").

### *Rockfon's Proposed Instruction No. 30 – Antitrust Damages – Lost Profits*

*Rockfon claims that it was harmed because it lost profits as a result of Armstrong's alleged antitrust violation. If you find that Armstrong committed an antitrust violation and that this violation caused injury to Rockfon, you now must calculate the profits, if any, that Rockfon lost as a result of Armstrong's antitrust violation. To calculate lost profits, you must calculate net profit: the amount by which Rockfon's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.*

### Armstrong's Objections

Armstrong does not object to this proposed instruction.

### *Rockfon's Proposed Instruction No. 31 – Causation and Disaggregation*

*If you find that Armstrong violated the antitrust laws and that Rockfon was injured by that violation, Rockfon is entitled to recover for such injury that was the direct result or likely*

*consequence of the illegal acts of Armstrong. Rockfon bears the burden of showing that its injuries were caused by Armstrong's antitrust violation, as opposed to any other factors. If you find that Rockfon's alleged injuries were caused in part by Armstrong's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of Rockfon's alleged injuries that was caused by Armstrong's alleged antitrust violation.*

*Rockfon claims that it suffered injury because it lost sales and profits as a result of Armstrong's exclusivity arrangements and the "No Rockfon" clause. Armstrong contends that any profits or sales lost by Rockfon occurred as a result of other factors that have nothing to do with the exclusivity arrangements at issue. Rockfon only may recover for damages caused by the alleged antitrust violation.*

### Armstrong's Objections

Armstrong objects to this proposed instruction for failing to adequately instruct the jury regarding the legal significance and relevance of the factors that Armstrong contends caused Rockfon's alleged losses and that have nothing to do with Armstrong's alleged antitrust violation, including Rockfon's inability to compete for jobs to repair and replace other manufacturers' tiles; Rockfon's lack of a strong specification position with architects; its lack of a trusted brand name in the United States market; the inferiority of Rockfon products in important areas such as sound blocking acoustics and sustainability; Rockfon's lack of capacity to produce more ceiling tile and its decision to delay building a U.S. manufacturing plant; lack of investment in its distributors; its lack of a fissured product; its failure to compete for sales to U.S. retailers; and USG's agreements and vertical integration with its distributors. *See* D.I. 293 at 50 (listing factors); *Davis*, 183 F.3d at 250 ("A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it."); *Massarsky*, 706 F.2d at 134 ("The trial court must instruct the jury in

accord with a party's contention if it is consistent with the evidence in the case."); *Richardson*, 334 F.2d at 338 ("A requested instruction in accord with a party's contention, and consistent with evidence in the case, must be granted unless the subject matter has been adequately covered in the court's main charge."); *Oparaji*, 297 F. App'x at 145 ("'[A] party is entitled to a specific instruction on its theory of the case,' if it is consistent with the evidence of the case" (quoting Charles Alan Wright & Arthur R. Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (2d ed.))).

Armstrong further objects to this proposed instruction as an inaccurate and incomplete statement of the law, due to its failure to instruct the jury that Rockfon is not entitled to damages from lawful competition, however aggressive. *Coleman*, 525 F.2d at 1353 (damages must "reflect only losses due to unlawful competition" and are improper when "attributable at least in part to . . . lawful competition."); *R.J. Reynold Tobacco*, 462 F.3d at 696 ("Yet as we remark frequently in antitrust litigation, 'cut-throat competition' is a term of praise rather than condemnation. . . . Businesses need not love their rivals . . .; consumers gain when firms try to 'kill' the competition and take as much business as they can . . . The question is not whether the defendant has tried to knock out other businesses but whether the means it has employed to that end are likely to benefit or injure consumers."); *Olympia Equip. Leasing Co. v. W. Union Tele. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("[I]f conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant.").

Armstrong also objects to this proposed instruction's failure to instruct the jury that Rockfon bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes, and that damages cannot be awarded if Rockfon has failed to show a reasonable basis to apportion Rockfon's alleged injury between lawful and unlawful causes or if apportionment can only be accomplished through speculation or

guesswork.  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1176 ("[O]ne pursuing antitrust recovery must establish that the damages suffered were caused by the defendant's participation in a scheme repugnant to the antitrust laws"; "[w]e overturned a jury verdict when review of the evidence showed that a damage award was partially based on legally-permitted competition by the defendant"; "antitrust recovery can constitute compensation for only those damages directly caused by unlawful competition."); *id.* (upholding jury instruction stating "'To the extent that you find that any money was lost because of general conditions in the steel industry not attributable to this conspiracy and so forth, you should, of course, not include any such sums in your calculation of damages'"); *MCI*, 708 F.2d at 1162 ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.").

Armstrong further objects to this proposed instruction's use of the phrase "'No Rockfon' Clause," as prejudicial and likely to confuse the jury.

Armstrong objects to this proposed instruction to the extent that it characterizes the challenged terms of Armstrong's distribution agreements as "exclusivity arrangements." Armstrong disputes whether certain contractual terms challenged by Rockfon are exclusivity arrangements, *see, e.g.*, D.I. 237 at 12-14, and therefore this proposed instruction is argumentative, one-sided, unbalanced, and unfairly prejudicial.  *See Hart*, 273 F.3d at 373 (jury instructions must "fairly and adequately submit[] the issues in the case to the jury"); *Tomasso*, 2007 WL 2458557 at *4 n.4 ("A requested instruction should not be argumentative or one-sided." (quoting Charles Alan Wright & Arthur R. Miller, 9A Fed. Prac. & Proc. Civ. § 2552 (2d ed.))); *id.* ("[C]ourt has a duty to give balanced jury instructions" (citing *Matias*, 836 F.2d at 750)).

**_Rockfon's Proposed Instruction No. 32 – Damages – Period_**

In this case, the antitrust laws do not allow for recovery of damages for any injuries sustained by Rockfon prior to September 1, 2013. If you find that Rockfon suffered injuries spanning both before and after September 1, 2013, then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries suffered after September 1, 2013.

When apportioning the damages between the two periods, you should be guided by the same principles I explained to you earlier. That is, you are permitted to make just and reasonable estimates in apportioning Rockfon's alleged damages. You are not required to apportion damages with absolute mathematical certainty or precision. However, the apportionment of damages must have a reasonable basis in the evidence.

**Armstrong's Objections**

Armstrong objects to this proposed instruction as misleading, prejudicial, and unfair, to the extent that it suggest to the jury that it is permitted to award damages to Rockfon caused by conduct occurring prior to September 1, 2013. The Court struck Armstrong's statute of limitations defense based on Rockfon's "representation of not pursuing a claim for conduct before September 1, 2013." D.I. 25 at 1. This proposed instruction would allow Rockfon to recover damages for conduct occurring before September 1, 2013, if the alleged damages suffered were suffered after September 1, 2013. This proposed instruction is therefore inconsistent with Rockfon's prior representation to the Court, and its inclusion would be deeply unfair and constitute a deprivation of due process, given that Armstrong's statute of limitations defense was stricken based on Rockfon's representation. Rockfon's commitment to not pursue claims for conduct before September 1, 2013 precludes claims based on the continued existence of contracts entered into before September 1, 2013. *See, e.g.*, *Auraria Student Housing at the Regency, LLC v. Campus*

*Village Apartments, LLC*, 843 F.3d 1225, 1247-48 (10th Cir. 2016) ("The act [giving rise to damages under the antitrust laws] must be more than the unabated inertial consequences of some pre-limitations action" (internal quotation marks omitted)); *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period."); *Barnosky Oils, Inc. v. Union Oil Co. of Cali.*, 665 F.2d 74, 81-82 (6th Cir. 1981); *Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975) ("[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.").  Armstrong points the Court instead to Instruction 32 of its proposed jury instructions, D.I. 293 at 53, which instructs the jury that it may award damages only for injuries suffered as a result of Armstrong conduct occurring from September 1, 2013 onwards.

Relatedly, Armstrong objects to this proposed instruction as misleading and confusing to the jury to the extent that it instructs the jury regarding apportionment of damages suffered by Rockfon before and after September 1, 2013.  As mentioned above, the Court struck Armstrong's statute of limitations defense based on Rockfon's "representation of not pursuing a claim for conduct before September 1, 2013."  D.I. 25 at 1.  Given that Rockfon is not pursuing claims for any conduct prior to September 1, 2013, it logically follows that Rockfon cannot possibly have suffered any injury prior to September 1, 2013.  The apportionment instruction here suggests otherwise to the jury, and is therefore misleading, confusing, and unfairly prejudicial.

DATE:  March 14, 2019                    Respectfully submitted,


                                         */s/ Kevin J. Mangan*_____

Daniel G. Swanson (*pro hac vice*)       Kevin J. Mangan (DE Bar No. 3810)
Shannon E. Mader (*pro hac vice*)        WOMBLE BOND DICKINSON (US) LLP
GIBSON, DUNN & CRUTCHER LLP              1313 North Market Street, Suite 1200
333 South Grand Avenue                   Wilmington, DE 19801
Los Angeles, CA 90071-3197               Tel:     320.252.4320
Tel:     213.229.7000                    kevin.mangan@wbd-us.com
dswanson@gibsondunn.com
smader@gibsondunn.com


Cynthia E. Richman (*pro hac vice*)      Reed Brodsky (*pro hac vice*)
Thomas G. Hungar (*pro hac vice*)        GIBSON, DUNN & CRUTCHER LLP
GIBSON, DUNN & CRUTCHER LLP              200 Park Avenue
1050 Connecticut Avenue, NW              New York, NY 10166-0193
Washington, DC 20036-5306                Tel:     212.351.5334
Tel:     202.955.8500                    rbrodsky@gibsondunn.com
crichman@gibsondunn.com
thungar@gibsondunn.com


Caeli A. Higney (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-2933
Tel:     415.393.8200
chigney@gibsondunn.com


*Attorneys for Defendant Armstrong World
Industries, Inc.*